689 A.2d 1301

**S.B. THOMAS, INC., et al.,**

v.

**Dennis A. THOMPSON.**

**No. 937 Sept. Term, 1996.**

Court of Special Appeals of Maryland.

March 4, 1997.

Lawrence G. Giambelluca (David A. Skomba, Erin M. Masson and Semmes, Bowen & Semmes, on the brief), Baltimore, MD, for Appellants.

Laura Guadalupe Morton (Kenneth P. Niman and Ingerman & Horwitz, on the brief), Baltimore, MD, for Appellee.

Argued before MOYLAN, HARRELL and SALMON, JJ.

MOYLAN, Judge.

The initial focus of this appeal is on whether the etiology of the herniated disc in this case was a complicated medical question. If the answer is "Yes," the focus then will turn to whether expert medical testimony is required to establish a legally sufficient, *prima facie* case of, depending on the allocation of the burden of production, either 1) a causal relationship or 2) the absence of a causal relationship between an earlier traumatic event and the subsequent herniation.

The herniated disc was suffered by Dennis A. Thompson, the appellee. The earlier traumatic event was a job-related injury sustained by him while working for S.B. Thomas, Inc. The appellee filed a claim with the Maryland Workers' Compensation Commission ("Commission"). The Commission ruled his current disability to have been causally related to the previous job-related injury. S.B. Thomas, Inc. and Travelers Indemnity Company of Illinois, the insurer, appealed the Commission's decision to the Circuit Court for Frederick County.

A trial was held before Judge Mary Ann Stepler, sitting with a jury. At the close of the appellants' case, the appellee made a Motion for Judgment contending that the appellants were required to present expert testimony on the causation issue because the issue involved was a "complicated medical question" and that they had failed to do so. Judge Stepler agreed and granted judgment in favor of the appellee. The appellants raise three issues on appeal, which we have reordered and reworded:

1. Whether the appellants are required to present expert medical testimony where the issue is the lack of causal connection and whether that issue involves a complicated medical question?

2. Whether the trial court erred in excluding testimony regarding the different reporting habits engaged in by the appellee when reporting work-related accidents and non-work-related injuries?

3. Whether the trial court erred by excluding a security camera videotape that showed the appellant walking and running from his place of work the day before the appellant allegedly suffered his present disability?

Our disposition of the first contention (or set of subcontentions) in favor of the appellee makes the other two contentions moot.

### The Factual Background

On October 6, 1992, the appellee filed a claim for workers' compensation benefits as a result of an accidental injury to his back suffered while he was performing work-related duties. He sustained the injury while attempting to "right" a 200–pound stack of trays that was tipping over on a conveyor belt. The appellants accepted the claim as valid and promptly initiated payment of benefits. As a result of that injury, the appellee missed only a short amount of work time. While continuing to receive medical treatment for his injury, the appellee was given "light duty." On November 12, 1992, the appellee was discharged from his medical treatment by Dr. Robert Fisher. At the time of his discharge, the appellee told Dr. Fisher that his symptoms were much improved, but that he still had some occasional pain in the lower back, sometimes radiating down the right leg and sometimes down the left. Both before the Commission and again at trial, the appellee described his condition during the six-to-seven-month period between being released from physical therapy treatment and when his back "locked up" on June 3:

[A]t work, I was bending over a lot and the pain never really went away. It decreased a lot after the physical therapy, but it never really went away, and it had just got— gradually kept getting worse and worse and worse until June when my back actually locked up.

From mid-October 1992 until June 3, 1993, the appellee did not seek additional medical treatment. According to the appellee, however, he did treat himself with over-the-counter medications. During that time period, the appellee also re-

sumed working "full duty," which involved bending, stooping, and some lifting. The appellee was able to complete his tasks, and never missed any time from work as a result of his previous back injury.

On the morning of June 2, 1993, when the appellee left his work, he was not suffering any unusual feelings of pain. On June 3, 1993, however, the appellee awoke to find that his back had "locked up," and the appellee then sought immediate medical attention. The appellee testified as to what he felt when he awoke on June 3:

> [B]asically I woke up and went to get up out of bed and noticed a sharp, severe pain in my low[er] back. Basically it was—the way I can describe it, it was the same kind of pain as I felt back in the October 6 incident.

The appellee ultimately underwent surgery for a herniated disc.

### The Commission's Decision

The appellee went back to the Workers' Compensation Commission and claimed that the disability that manifested itself on June 3 was the result of the October 6 job-related injury. The appellants opposed the claim, arguing that there was no causal relationship between the injury of October 6 and the disability that became apparent on June 3.

Before the Commission, the appellee, as claimant, assumed the full burden of proving his case. As proponent of the proposition that there was a causal connection between the accident of October 6 and the disability of June 3, he had 1) the burden of production of a *prima facie* or legally sufficient case to permit the Commission to find in his favor, as a matter of law; and 2) the burden of persuasion to convince the Commission so to find, as a matter of fact.

Although the record of what transpired before the Commission is not before us, the appellee obviously carried both burdens of proof. On September 21, 1993, the Commission found that "the Claimant sustained an accidental injury arising out of and in the course of employment on October 6, 1992 . . .

and that the disability of the Claimant is the result of the aforesaid accidental injury."

That legally established linkage between the precipitating event of October 6 and its consequence as of June 3 thereby became the prevailing and axiomatic reality—the documented *status quo*—the given—from which all subsequent litigation would be required to proceed.

### *The Appeal to the Circuit Court*

■ The employer and the insurer appealed to the Circuit Court for Frederick County. There are, of course, two alternative modalities that an appeal from the Workers' Compensation Commission may follow. One is pursuant to Labor and Employment Art. § 9–745(e), which replicates the routine appeal process from administrative agency decisions generally. According to that modality, the circuit court reviews the Commission's action on the record and determines whether the Commission 1) acted within its power and 2) correctly construed the law and facts.

The other and more unusual modality is that spelled out by § 9–745(d), which provides for what is essentially a trial *de novo*. *Holman v. Kelly Catering*, 334 Md. 480, 484, 639 A.2d 701 (1994); *Smith v. State Roads Commission*, 240 Md. 525, 533, 214 A.2d 792 (1965); *Richardson v. Home Mutual*, 235 Md. 252, 255, 201 A.2d 340 (1964); *General Motors Corp. v. Bark*, 79 Md.App. 68, 74, 555 A.2d 542 (1989). R.P. Gilbert and R.L. Humphreys, *Maryland Workers' Compensation Handbook* (1988), 312–314, discusses the fundamentally different natures of the two appeal modes:

> The practice is that appeals are presented to trial courts in one of two fashions: (1) the submission of the case to the judge on the basis of the record made before the Commission; or (2) a *de novo* evidentiary hearing before the court sitting with or without a jury. (Footnote omitted).

In this case, the appellants chose the avenue of an essentially *de novo* trial rather than that of an appeal on the record. In *General Motors Corp. v. Bark*, 79 Md.App. at 76, 555 A.2d

542, we discussed the difference between those fundamentally dissimilar forms of review:

> Under that dichotomy, it is the first of these appeal modes that requires the circuit judge to determine under Section [9-745(e) ]:
>
> > 1) whether the Commission has "justly considered all of the facts concerning the injury,"
> >
> > 2) whether it has "exceeded the powers granted it by the [title]," and
> >
> > 3) whether it has "misconstrued the law and the facts applicable in the case decided"
>
> and then directs him to affirm "the decision of the Commission" if he determines "that the Commission has acted within its powers and has correctly construed the law and facts." Thus far, there is nothing of a *de novo* nature involved. Thus far, a review by the circuit court of the record before the Commission would suffice. The statutory direction to affirm an error-free Commission decision would not apply, however, to the alternative appeal mode of *de novo* trial. Indeed, once the circuit court embarks upon its *de novo* fact-finding mission, it is totally unconcerned with whether the Commission "correctly construed the law and facts" or not.

When the form of appellate review invoked at the circuit court level is that of a *de novo* determination of the facts, § 9-745(b) takes on potentially great significance at such a *de novo* trial:

> (b) *Presumption and burden of proof.*—In each court proceeding under this title:
>
> (1) the decision of the Commission is presumed to be prima facie correct; and
>
> (2) the party challenging the decision has the burden of proof.

These twin provisions—the opportunity for a *de novo* factual determination at the circuit court level coupled with the presumption of correctness of the Commission's finding—have

been part of the law since the Workmen's Compensation Act was first enacted by Chapter 800 of the Acts of 1914. Their interaction over the decades has given rise to the description of the review procedure as something that is "an essential trial *de novo.*" It was in *General Motors Corp. v. Bark,* 79 Md.App. at 79–81, 555 A.2d 542, that we undertook for the first time to explore the significance of the qualifier "essential" and to ask, "What is the difference between an essential trial *de novo* and a true trial *de novo?*"

■ After pointing out that "[a] true trial *de novo,* of course, puts all parties back at 'square one' to begin again just as if the adjudication appealed from had never occurred," *General Motors Corp. v. Bark* noted that one difference between a true trial *de novo* and an essential trial de novo is that in the latter, one does not treat the adjudication appealed from as if it had never occurred. It is, rather, the case that the presumptively correct outcome of that adjudication is admissible as an item of evidence and is the proper subject of a jury instruction. *Holman v. Kelly Catering,* 334 Md. 480, 639 A.2d 701 (1994). It is an evidentiary fact that may well tip the scales of persuasion.

■ Aside from that difference, the even more significant potential difference is that sometimes there is a drastic shift in the allocation of the burdens of proof—both of production and of persuasion. If, of course, the claimant loses before the Commission and then appeals to the circuit court

the provision, as a practical matter, is largely meaningless. The claimant has the burden of producing a *prima facie* case before the trial court, lest he suffer a directed verdict against him, just as he, as the original proponent, had that same burden before the Commission.... The claimant has, moreover, the same burden to persuade the trial court by a preponderance of the evidence that his claim is just as he had to persuade the Commission in the first instance.

79 Md.App. at 79–80, 555 A.2d 542.

■ It is, as in the case now before us, when the claimant wins before the Commission and the original defendant takes

the appeal to the circuit court that the difference becomes dramatic:

It is then that the allocation of burdens switches. In such a case, the decision of the Commission is, *ipso facto*, the claimant's *prima facie* case and the claimant runs no risk of suffering a directed verdict from the insufficiency of his evidence before the circuit court. Indeed, the successful claimant, as the non-moving party on appeal, has no burden of production. The qualifying language also gives the successful claimant below the edge—the tie-breaker—if the mind of the fact finder (judge or jury) is in a state of even balance. The tie goes to the winner below.

79 Md.App. at 80, 555 A.2d 542.

This phenomenon of shifting burdens was first discussed over seventy-five years ago in *Stewart & Co. v. Howell,* 136 Md. 423, 433–34, 110 A. 899 (1920), by the first Judge Adkins:

[I]t simply puts the burden of proof upon the party taking the appeal, whether he be plaintiff or defendant. In other words it establishes no new rule when the plaintiff happens to be the party appealing, as the burden was always upon the plaintiff to prove his case. But it shifts the burden from the plaintiff to the defendant where the defendant loses before the Commission and desires to appeal from its decision, requiring the defendant in such a case to satisfy the jury by a preponderance of testimony that the plaintiff is not entitled to the award made by the Commission.

### The Circuit Court Ruling

As the appellants mounted their essentially *de novo* case before Judge Stepler and a jury, therefore, they confronted three impediments that had not earlier been theirs before the Commission.

1. Theirs was now the burden of production affirmatively to establish, as a matter of law, a *prima facie,* to wit, a legally sufficient, case *that there was no causal connection* between the earlier injury and the later disability. Theirs was not the lesser task of merely casting doubt on the

claimant's proof of causation, for the claimant no longer
bore any obligation to prove causation; that had become a
"given" in the case. Theirs was, rather, the greater task of
*generating affirmatively a genuine jury issue of non-causation.* As the risk of non-production, they could suffer a
judgment against them, as a matter of law, and the case
would never be allowed to go to the jury.

2. Theirs was also now the burden of ultimate persuasion.
If they successfully shouldered the burden of production
and the case were permitted to go to the fact finder, judge
or jury, theirs was also the burden of persuading the fact
finder of *the fact of non-causation* by a preponderance of
the evidence. If the mind of the fact finder were in a state
of absolute equipoise between causation and non-causation,
the appellants would, as the self-evident risk of non-persuasion, lose.

3. As an additional factor making that burden of persuasion more difficult, the jury would be informed that the
Workers' Compensation Commission had earlier determined
that there was, indeed, a causal relation between the earlier
injury and the later disability. As further factors adding to
the weight of that burden of persuasion, the jury would be
instructed that the decision of the Commission was presumed to be correct; that the burden was on the appellants
to overcome that presumption of correctness; and that, if
they were in doubt as to whether the presumption had or
had not been overcome, they would treat the Commission's
finding of causation as factually correct.

Before Judge Stepler, the appellants were never required to
address the second and third hurdles. Both of them involve
the problem of persuasion, and the case never got to the point
where persuasion even became an issue. The appellants failed
to clear even the first hurdle, which was the burden of
production. The appellants seem reluctant, especially as expressed in their reply brief, to accept the full implications of
having had transferred to them the burden of production:

The Circuit Court granted judgment prematurely. When
granted, the Claimant had not presented his case in chief.

Specifically, he had not provided any medical testimony of causal relationship. It certainly cannot be assumed either that the Claimant would have been able to provide such testimony or that effective cross examination would not have undermined or formed a basis for completely excluding such testimony.

Such observations might have been apposite if the appellee had had some burden of proof, but, of course, he had none. The appellee was not required to prove anything. He had no burden of production. Even on the question of ultimate persuasion, had the case gone that far, he could have offered nothing and simply relied on the failure of the appellants to rebut the presumption of correctness of the Commission's earlier ruling.

When an appeal to the circuit court from the Workers' Compensation Commission is in the posture of this case, to wit, with the claimant's having prevailed before the Commission, the "essential trial *de novo*" is, in effect, a mirror image of the earlier hearing before the Commission. With respect to the duty of going forward with evidence, the allocations of both burdens of proof, and even instructions as to the factual *status quo* that is the point of departure, everything has become the reverse image of what once it was. Whereas once the right hand had had to push all the buttons and turn all the knobs, it was now the left hand that has to do so.

In terms of the task facing the appellants, a more descriptive metaphor may be that they, before the circuit court, are required to roll the film of historic events backward. Whereas once the appellee had the task of filming forward the story of causation, that had already been done before the case arrived at the circuit court. Causation had already been established as the presumptively correct *fait accompli,* and the appellants took on the affirmative burden of rolling the film backward to prove a different version of what had, or according to them had not, happened. It was past the time for simply criticizing someone else's storytelling. As in the classic Japanese play

*Rashomon,* it was now a different character who assumed the narrative burden.

The appellants' newly assumed narrative burden before the circuit court was to show that the appellee's current disability was not causally related to the accidental injury suffered by him on October 6, 1992. The appellants, rather than produce any expert medical testimony to that end, sought to demonstrate "factually" that the appellee must have had a non-work-related accident that caused his current disability. The appellants sought to prove that the appellee's current condition was not work-related by noting 1) the long delay between the actual work-related accident and the current disability, 2) the relatively "minor" nature of the appellee's injury immediately after the work-related accident, 3) the appellee's statement to a doctor on June 11, 1993 that he "did have another back injury," and 4) the appellee's statements to Ms. Kolb and Mr. Anderson on the day his back "locked-up."

Judge Stepler nonetheless ruled that the appellants had failed successfully to shoulder their burden of production:

[T]he decision of the Worker's Compensation Commission was that the disability was causally related to the accident and that the Commission decision in a proceeding such as this is presumed to be correct. The petitioner in this case, who is the employer-insurer at this point, has the burden of showing a prima facia case to show that there is no causal connection between the injury and the accident that occurred in October of 1992. In this case, the claimant's disability ... was a back injury which included pain radiating down both legs and resulting in a herniated disk which required surgical treatment. *This ... I find to be a complicated medical question involving the need for expert medical testimony* in the petitioner's case in order to overcome a motion for judgment....

[A]t the time that the employer-insurer rested, ... *they had presented no medical evidence ... on the causal connection issue.* In essence, the employer-insurer was asking the jury to speculate that the claimant must have had some

unexplained accident or . . . event that caused his injury and I find that that was not legally sufficient to sustain their burden . . . (Emphasis supplied).

Although we are strongly of the opinion that the appellants would have failed to satisfy their burden of production even if they had not been required to produce some expert medical evidence of non-causation, we will follow Judge Stepler's decisional rationale in assessing her ruling. She ruled that under the circumstances of this case, the issue of non-causation was a complicated medical question calling for expert medical testimony. She further ruled that when the appellants failed to produce such expert medical testimony, they *ipso facto* failed to satisfy their burden of production. We affirm her ruling in that regard.

The appellants also attempted to use a videotape of the appellant walking and running the day before the appellee's back allegedly "locked up" as evidence that an intervening accident had occurred, but that evidence was excluded by the trial court. The trial court also excluded evidence that the appellee reported his current condition to a personnel manager, which allegedly the appellee only had a habit of doing when his injury was not work-related. The appellants also appeal from the trial court's decisions to exclude those two items of evidence, but we find it unnecessary to address either issue. Indeed, assuming *arguendo* that the appellants are correct in stating that certain evidence excluded by the trial court should have been admitted, we still would hold that the trial court was correct in granting the appellee's Motion for Judgment. Even construing the evidence presented in a manner most favorably to the appellants, we hold that the evidence was insufficient for a jury to find for the appellants as a matter of law. Medical expert testimony was essential to prove the lack of a causal connection.

### The Necessity for Expert Medical Testimony on the Issue of Causation

On the subject of what is a "complicated medical question" so as to require by way of proof expert medical testimony, the

oracle to which all Maryland practitioners, including ironically both parties in this case, repair is *Wilhelm v. State Traffic Safety Comm'n,* 230 Md. 91, 185 A.2d 715 (1962). At first glance, it is a never-failing oracle, for it has something to say to everybody. Because of that fact, it is a good teaching vehicle, able to teach by comparison.

In *Wilhelm,* there were critical questions as to not *one* causal connection between an earlier injury and allegedly harmful effect, but as to *three* causal connections between an earlier injury and *three* allegedly harmful effects. Two of those possible causal connections were held to be *medically complicated questions* requiring expert medical testimony. (Part II, 230 Md. at 97–101, 185 A.2d 715). The third was held to be uncomplicated and, therefore, within the competence of lay jurors without benefit of expert medical testimony. (Part V, 230 Md. at 103–06, 185 A.2d 715).

Not surprisingly, it is that latter facet of the *Wilhelm* opinion (Part V) to which the appellants direct our attention. Also not surprisingly, it is the former facet of *Wilhelm* (Part II) to which the appellee directs our attention.[1] Hopefully, the healthy collision between the thesis of *Wilhelm* (Part II) and the antithesis of *Wilhelm* (Part V) may yield, according to the classic Hegelian dialectic, a desired synthesis.

Grace Wilhelm suffered "a severe whiplash sprain of the neck and of the back" when the automobile in which she was sitting was "rear-ended" by another automobile on May 2, 1959. She ultimately sued the State of Maryland Traffic Safety Commission, employer of the driver of the second automobile, for damages, including 1) damages for "psychiatric

---

1. The self-serving parochialism of the selective citations to *Wilhelm* reminds us, irresistibly, of the parable of the three blind men and the elephant:

"Aha," said the first blind man, feeling the tail of the elephant, "So, an elephant is like a snake." "Oh, no," said the second blind man, feeling the side of the elephant, "An elephant is like a wall." "You are both wrong," said the third blind man, feeling the trunk of the elephant, "An elephant is like a tree."

Absent an overview, *Wilhelm* is thus elephantine.

involvement, psychosomatic factors, or mental state," resulting from the accident; 2) abdominal and lower back pain associated with her menstrual period; and 3) a loss of pigmentation on her face. With respect to all three of those aspects of damages, the trial judge ruled against her, as a matter of law, and refused to let the jury consider those three questions.

### A. The Thesis: Example # 1:

Two doctors testified that Ms. Wilhelm suffered some mental problems following the accident. Although the accident had occurred on May 2, one doctor noted, for the first time the following February 1, that "her symptoms were obscured by a deep-seated psychological overlay." A second doctor first noted a little over six months after the accident that "there is a very profound psychosomatic factor that ... serves to aggravate or accentuate any true organic cause that this young lady may have for her persistent and prolonged back problems" and that the pain produced by such a factor, although imaginary, was disabling. Neither doctor testified, however, that the accident itself "caused, produced, or precipitated any emotional involvement, neurosis, or other psychological disorder in the appellant." 230 Md. at 98, 185 A.2d 715.

Because of the lack of expert medical testimony linking the accident and the subsequent psychological condition, the trial judge took that sub-issue away from the jury. In affirming, the Court of Appeals held, 230 Md. at 101, 185 A.2d 715:

> There can be little doubt, we think, that *a question involving the causes of emotional disturbances* in a person sufficient to evoke, subconsciously, grossly exaggerated symptoms *is an intricate and complex one, peculiarly appropriate for science to answer.* To allow a jury of laymen, unskilled in medical science, to attempt to answer such a question would permit the rankest kind of guesswork, speculation and conjecture. We hold that the trial court correctly refused to submit the question here involved to the jury. (Emphasis supplied).

### B. The Thesis: Example # 2:

There has been some tendency in the case law, seemingly inadvertent, to limit *Wilhelm*'s holding on this issue to cases "involving the causes of emotional disturbances," *see, e.g., Johnson v. Zerivitz*, 234 Md. 113, 116, 198 A.2d 254 (1964). The appellants, in their brief, characterize *Wilhelm* as holding that "expert testimony [is] necessary to prove causal connection between an automobile accident and emotional disturbances suffered to evoke, subconsciously, grossly exaggerated symptoms." As an antidote to such a limited reading, it is fortunate that the *Wilhelm* opinion also included another sub-contention involving a physical symptom.

Following the May 2 accident, Ms. Wilhelm complained, regularly through the months of October and November, to her doctors of "difficulty with her low back associated with her menstrual period." For the lack of any expert medical testimony linking the accident to the low back pain during her menstrual periods, the trial judge took that aspect of damages away from the jury. In affirming him in that regard, the Court of Appeals held, 230 Md. at 101, 185 A.2d 715:

> What we have just said applies, with equal force, to the question of *causal connection between the accident and abdominal and back pains associated with the wife's menses. This question, too, was a complicated one, presenting an involved and intricate medical inquiry, the solution of which was singularly suitable for determination by medical science.* The symptoms here involved did not develop until several months after the accident, and, not only did no expert (nor did any lay witness except by implication) testify that the accident caused, or was in any way connected with, the complaints now under consideration, but the experts produced by the appellants testified either that they were unable to "correlate the physical findings to her menstrual period," or that there was no connection between "the abdominal pains complained of and the accident." ... We hold that the trial court was also correct in refusing to submit this question to the jury. (Emphasis supplied).

## C. The Antithesis:

By contrast, Part V of the *Wilhelm* opinion, 230 Md. at 103–06, 185 A.2d 715, dealt with a causal connection that was not a complicated medical question and did not, therefore, require expert medical testimony in order to generate a genuine jury issue. In the May 2 accident, Ms. Wilhelm was "thrown forward and her head hit the sun visor, causing a 'big bruise' which did not disappear for three or four months." She then noticed that the skin of her face and her eyebrow had turned white at the location of the bruise. She notified her doctor of this depigmentation as early as June 23. The trial judge, however, refused to submit that aspect of the larger damages question to the jury. In reversing the trial judge in that regard, the Court of Appeals held, 230 Md. at 104, 185 A.2d 715:

> We think the question here involved comes within the category of the cases first mentioned under heading II. Where a woman, 30 years of age, who had never had any previous depigmentation of the skin of her face, is shown to have suffered a bruise to her face on May 2nd, and within a few weeks thereafter a depigmentation develops, which is reported to, and confirmed by, the doctor on June 23, and the loss of pigmentation is confined solely to the area of the lesion, common experience, knowledge and observation of laymen, we think, would permit a rational inference that the bruise had probably caused the loss of pigmentation, in the absence of evidence of any other equally probable cause. This, with the other evidence in the case, was all that was necessary to make out a *prima facie* case on the issue here being considered.

On this proposition, the Court of Appeals cited as authority the decision of the Supreme Court of Rhode Island in *Valente v. Bourne Mills*, 77 R.I. 274, 75 A.2d 191 (1950). It referred to the *Valente* case as "a leading one on the subject now under consideration" and then quoted it with approval:

> "We concede that in the great majority of cases such testimony [testimony of experts] ordinarily is necessary

because of the seeming absence of connection between a particular accident and a claimed resulting injury. But in other cases involving special and peculiar circumstances, medical evidence, although highly desirable, is not always essential for an injured employee to make out a prima facie case, especially if the testimony is adequate, undisputed and unimpeached. Thus where, as in the instant case, injury appears in a bodily member reasonably soon after an accident, at the very place where the force was applied and with symptoms observable to the ordinary person, there arises, in the absence of believed testimony to the contrary, a natural inference that the injury, whatever may be the medical name, was the result of the employment. Absolute certainty is not required in any case. If the reasonable probabilities flowing from the undisputed evidence disclose a progressive course of events beginning with an external accident in which each succeeding happening including the injury appears traceable to the one that preceded it medical evidence is not essential for an injured employee to make out a prima facie case."

### D. The Synthesis:

Out of *Wilhelm*'s resolution of three efforts to prove a causal connection, two of which were resolved in one direction and the third in another, what, then, is the synthesis? It is impossible to frame any neat verbal formula that will prove readily dispositive of future cases. All such cases must be resolved on a case-by-case basis and the best that the case law can do is to articulate some general guidelines. *Wilhelm* undertook such an articulation, 230 Md. at 99–100, 185 A.2d 715:

There are, unquestionably, many occasions where the causal connection between a defendant's negligence and a disability claimed by a plaintiff does not need to be established by expert testimony. Particularly is this true when the disability develops coincidentally with, or within a reasonable time after, the negligent act, or where the causal connection is clearly apparent from the illness itself and the

circumstances surrounding it, or where the cause of the injury relates to matters of common experience, knowledge, or observation of laymen. However, where the cause of an injury claimed to have resulted from a negligent act is a complicated medical question involving fact finding which properly falls within the province of medical experts ... proof of the cause must be made by such witnesses. (Citations omitted).

By way of implementing such necessarily general guidelines, the best the case law can do is to provide a series of examples, some falling on one side of the legal sufficiency line and some on the other. At least, then, future cases will be able to subject themselves to a color-matching test, taking the proof that has been offered on the subject of causation in a particular case and then seeing which of the precedents it most closely resembles.

*Jewel Tea Co., Inc. v. Blamble,* 227 Md. 1, 174 A.2d 764 (1961), was actually decided one year before the *Wilhelm* case. In *Jewel,* an appeal had been taken from the then Workmen's Compensation Commission to the circuit court. The claimant, who had first suffered a job-related fall resulting in injury to both ankles and subsequently suffered a heart attack, was claiming that she was one hundred per cent permanently disabled. The employer asked the circuit court judge to rule that the evidence was not legally sufficient to submit to the jury the issue of one hundred per cent permanent disability. The evidence on that issue was the lay testimony of the claimant herself and of her landlady and largely involved the subjective feeling of the claimant that "she did not feel she could go back to work, that she could not climb stairs, and had certain feelings of heaviness in her heart and in her arm." The trial judge submitted the issue to the jury and the jury found one hundred per cent permanent disability. In reversing, the Court of Appeals held, 227 Md. at 7, 174 A.2d 764:

It is obvious that in cases such as the one before us the experience and information secured by medical experts concerning the type, degree, extent and duration of disability attendant upon the disease involved here, and the super-

imposing of the findings upon the general physical and mental condition of the patient, are invaluable. In the instant case such expert testimony was in fact, in our opinion, determinative, in contradistinction to the testimony of the lay witnesses, which, from the nature of this case, could only be conjectural.

It has been held that *reliance on lay testimony alone is not justified when the medical question involved is a complicated one, involving factfinding which properly falls within the province of medical experts.* (Emphasis supplied).

In *Craig v. Chenoweth,* 232 Md. 397, 194 A.2d 78 (1963), the plaintiff had suffered injuries to her head, neck, and shoulder when the automobile which she was driving was rear-ended by another car. The ultimate controversy was with respect to her claim that she also suffered, as a result of the accident, a partial paralysis of her left forefinger and thumb. It was approximately six weeks after the accident, and while still being treated for her neck and shoulder injuries, that she first suffered the partial paralysis.

In arguing that the issue should have been submitted to the jury, she maintained that the paralysis was "reasonably coincidental with the negligent act, and was by the common experience, knowledge, and observation of lay jurymen within the usual complications of whiplash-type injuries." Notwithstanding that argument, the trial judge refused to submit the issue to the jury. In affirming that ruling by the trial court, the Court of Appeals held, 232 Md. at 400–01, 194 A.2d 78:

The rule, and the many authorities cited in support of it in *Wilhelm,* make it clear that *the causal connection,* if any existed, *between the appellee's negligence and the paralysis of Mrs. Craig's hand was not of the type which is provable without medical testimony.* The paralysis did not occur coincidentally with, or within what we feel was a reasonable time, under the facts of this case, after the accident had occurred. The causal connection was not clearly apparent from the paralysis itself or the circumstances surrounding

it, nor was the connection a matter within the common knowledge of laymen. That this is so is manifest from the fact that the appellants' own medical expert was unable to say that there was any causal connection between the accident and the paralysis, thus effectually precluding any conclusion that this was a matter clearly apparent to laymen or within their common experience and knowledge. (Emphasis supplied).

In *Johnson v. Zerivitz*, 234 Md. 113, 198 A.2d 254 (1964), the appellant was a taxicab driver who had been rear-ended by a truck. The sole question before the trial court was the nature and extent of his injuries. He claimed, *inter alia*, that as a result of his injuries, he sustained an emotional injury or disturbance. In affirming the decision of the trial judge not to let that issue go to the jury, the Court of Appeals relied on the *Wilhelm* opinion for the proposition that "the causes of emotional disturbances are complicated medical questions, proof of which must be made by expert medical testimony." 234 Md. at 116, 198 A.2d 254.

The appellant in that case also objected to the failure of the trial judge to submit to the jury his claim that as a result of the May, 1960 accident, his leg "gave way" two-and-a-half years later when he was filling a hot water bottle and resulted in his being scalded. In again affirming the ruling of the trial judge not to let the issue go to the jury, the Court of Appeals held, 234 Md. at 118, 198 A.2d 254:

There was no testimony sufficient to prove that the scalding in December 1962 was caused by the accident in question. . . . *Under these circumstances expert medical testimony was again needed to establish a causal connection, but again, no such testimony was offered. . . . [T]he causal connection between any injury to the appellant's leg and the accident in question was an intricate and involved medical question which could only have been established by medical testimony.* (Emphasis supplied).

In *Richard F. Kline, Inc. v. Grosh*, 245 Md. 236, 226 A.2d 147 (1967), the defendant employer moved for a directed verdict on the ground that the evidence was not sufficient to

show causation between the accidental injury and the ultimate disability claimed. The trial judge denied the motion and the Court of Appeals affirmed, observing, 245 Md. at 245, 226 A.2d 147:

> In this case *the appellants* in the court below *failed to present any medical testimony* on the evaluation of the disability of the appellee's left leg and, *a fortiori,* they had no testimony as to the effect that such a disability might, or might not, have on the appellee's body as a whole. (Emphasis supplied).

In *Kraft v. Freedman,* 15 Md.App. 187, 289 A.2d 614 (1972), the causal relationship being analyzed by this Court in terms of its necessary proof was one between an automobile accident, resulting directly in a neck injury, and the recurrence of the plaintiff's ileitis (an inflammation of the small intestine). We had no difficulty in holding, 15 Md.App. at 194, 289 A.2d 614, that such a causal relationship was a complicated medical question requiring expert medical testimony:

> Applying *Wilhelm* to the undisputed facts shown by the testimony of Dr. Bakal concerning *the nature of the disease of ileitis and the complicated medical question involved* in determining whether its recurrence was brought about as a natural incident of the disease or from the accident, we have no difficulty in concluding that *expert medical testimony* is *required,* under the accepted rule, *in order to establish the causal connection,* if any, between the accident and the recurrence in the instant case. (Emphasis supplied).

In *Strong v. Prince George's County,* 77 Md.App. 177, 549 A.2d 1142 (1988), the issue before us was the causal connection between an automobile accident suffered by a Prince George's County police officer and the onset of pancreatitis several months later. In reversing the decision of the trial court awarding compensatory damages, this Court had no difficulty in concluding that the proof of such a causal connection must fail, as a matter of law, in the absence of expert medical testimony. We held, 77 Md.App. at 184, 549 A.2d 1142:

> Applying *Wilhelm* and its progeny to the situation with which we are faced, we conclude that *expert medical testi-*

*mony was necessary to establish the causal connection, if any, between the accident and the pancreatitis* Gheen developed several months later. Reports submitted to the commission by various medical experts established that a number of things can cause a person to develop pancreatitis. A severe injury to the stomach is just one of them. Moreover, at least one medical expert wrote that, in view of the fact that the symptoms did not develop until several months after the accident, it was quite unlikely that the pancreatitis was caused by the accident. Under these circumstances we think that *expert medical testimony should have been presented. Without such testimony, the evidence was insufficient to support the award of damages.* (Emphasis supplied).

Contrasted with all of those cases holding that the causal relationship in issue was a complicated medical question requiring expert testimony is the decision of this Court in *Schweitzer v. Showell,* 19 Md.App. 537, 313 A.2d 97 (1974). At issue there was the causal connection between an automobile accident suffered by the plaintiff in August, 1967 and an injury sustained by him in October, 1968 when his leg gave way as he was pushing a stalled vehicle. Despite the absence of an express medical opinion linking the two events, Judge Menchine for this Court held that the evidence of causation was sufficient to have permitted the case to go to the jury:

It is true that no single witness, medical or lay, unequivocally established the causal connection between the subject accident and the Assateague injury. However, the jury could find probable causal connection from a selective consideration of the entire record. Under the testimony of either or both of the doctors the jury would be justified in concluding the Assateague incident probably was caused by a weakness of the left leg that in turn had been occasioned by the accident of August 27, 1967, if it accepted the testimony of Showell.

19 Md.App. at 543–44, 313 A.2d 97.

To the extent to which we can distill any general wisdom out of the case law, it seems to be this. A genuine

jury issue as to the causal relationship between an earlier injury and a subsequent trauma may sometimes be generated, even in the absence of expert legal testimony, when some combination of the following circumstances is present: 1) a very close temporal relationship between the initial injury and the onset of the trauma; 2) the manifestation of the trauma in precisely the same part of the body that received the impact of the initial injury; 3) as in *Schweitzer v. Showell,* some medical testimony, albeit falling short of a certain diagnosis; and 4) an obvious cause-and-effect relationship that is within the common knowledge of laymen.

■ Conversely, the causal relationship will almost always be deemed a complicated medical question and expert medical testimony will almost always be required when one or more of the following circumstances is present: 1) some significant passage of time between the initial injury and the onset of the trauma; 2) the impact of the initial injury on one part of the body and the manifestation of the trauma in some remote part; 3) the absence of any medical testimony; and 4) a more arcane cause-and-effect relationship that is not part of common lay experience (the ileitis, the pancreatitis, etc.)

■ When all is said and done, we are perhaps reduced to a truism: the stronger the case for the causal connection even absent expert medical testimony, the lesser the need for such testimony; the weaker the non-medical case for the causal connection, the greater the need for such testimony.[2] There is more involved, of course, than a simple inverse proportion between the strength of the non-medical-expert case of causation and the need for expert medical testimony. Some questions of causation might involve medical knowledge so recondite that expert testimony would always be required. Other questions of causation would not. There can be no hard and

---

2. Is it possible that all the juridical profundities of legal mandarins, pundits, and poo-bahs have produced something that could have been as well said by a bright fifth grader?:

"If it's needed to prove your case, you have to have it; if it isn't, you don't."

fast rule controlling all cases. It does appear clear, however, that when there is a genuine issue as to whether there is a causal connection between an earlier injury and a subsequent disability, in the majority of cases it will be a complicated medical question requiring, as a matter of law, expert medical testimony.

### Is a Complicated Causation Problem Complicated in Both Directions?

In one sense, the case law is skewed. All of the cases we have discussed involved the legal sufficiency of the proof of *causation*. The case now before us, of course, has reverse English on the ball. We are here concerned with the legal sufficiency of the proof of *non-causation*. Is there a difference? Judge Stepler ruled that, under the circumstances of this case, there was not:

> The fact that the employer-insurer is attempting to disprove causal connection rather than prove it certainly should not matter. In either case, the question is medical in nature and certainly not within the experience of lay witnesses, [who] are the only ... witnesses [who] have been presented in the case. Apparently claimant's disability which arose seven months, several months, after the accident was not diagnosed after he was seen by a number of doctors and had sophisticated diagnostic testing. Just as the claimant would be required, if he had the burden of proof of going forward to demonstrate causal relationship through expert testimony, I would find that the employer-insurer seeking to disprove the relationship has the same requirement, and the prima facia requirement will require medical testimony, so for that reason, ladies and gentlemen, I have granted the motion.

■ Generally speaking, when the relationship between an earlier injury and a subsequent disability presents a complicated medical question so that expert medical testimony would be required to establish a *prima facie* case of *causation,* expert medical testimony would also be required, when the allocation of the burden of production is reversed, to establish

a *prima facie* case of *non-causation.* If the possible relationship between two medical events represents a difficult medical issue, it would make little or no difference whether we were, depending on the vagaries of trial procedure, attempting to connect or to disconnect the two events. Expert medical knowledge as to the expected *sequelae* of an injury would be equally valuable and, indeed, necessary, regardless of the direction in which the burden of proof was moving.

We hesitate to announce a perfect analogy between the burden of proving causation and the burden of proving non-causation, primarily because innate caution makes it prudent "never to say never" or otherwise to speak in absolutes. There may be, conceivably, some inherent differences between the affirmative proof of a positive proposition and the affirmative proof of a negative proposition. It is always possible that some non-medical testimony may be sufficiently more probative in one direction than in the other as to alter the nature of the respective required medical proofs. At the very least, however, there is a very strong analogy between proving causation and proving non-causation. When the possible relationship is a complicated medical question, moreover, we can envision no distinction between the two procedural positions. If expert medical testimony is required to connect two events in the first instance, it is, once that connection has been established, equally required to disconnect them.

In the present case, we hold that expert medical testimony was as surely required for the appellants to prove non-causation as it would have been required for the appellee to prove causation, had the decision of the Workers' Compensation Commission gone in the opposite direction. Before the Commission, the status quo was that there was no causal relationship between the events of October 6 and June 3. The appellee, as claimant, was the proponent who was required to prove that there was such a relationship. He successfully did that. Before the circuit court, therefore, the new *status quo* was that there was a causal relationship between the events of October 6 and June 3. The appellants became the proponents and took on the affirmative burden of proving noncausation.

Their burden in that regard was no different than would have been the appellee's burden, had he been the moving party at the circuit court level. It was not enough for the appellants to introduce *some* relevant evidence that might have been sufficient to cast doubt on the appellee's case if the appellee had had the burden. If that were all that was required of the appellants, the presumption of correctness of the Commission's decision and the shifting of burdens at the circuit court level would be meaningless. That, in effect, would shift the burden back to the claimant and permit the appellants simply to throw darts at his case. Theirs, however, was the greater burden of proving, from the ground up, an affirmative case of non-causation. In this case, the analogy between the proof of non-causation and the proof of causation applies.

### *A Prima Facie Case of Non–Causation Required Expert Medical Testimony*

■■■ We affirm Judge Stepler's ruling that the possible relationship between the events of October 6 and June 3 was a complicated medical question and that expert medical testimony was, therefore, required to establish a legally sufficient, *prima facie* case of non-causation. Whether an injury to the back could set in motion a process that could result in a herniated disc eight months later was a question that self-evidently called for input from medical experts. Whether the appellee's "locked back" on June 3, as the manifestation of the herniated disc, could have come on suddenly or would have been preceded by a slow and steady build-up of complications was a complicated medical question calling for input from medical experts. This was not a subject matter within the common understanding of laymen. We hold that in the absence of expert medical testimony, the appellants failed to meet their burden of production. Judge Stepler's granting of judgment in favor of the appellee was proper.

Under the circumstances, the appellants' other contentions about proffered evidence that was not admitted are moot. Without suggesting any merit in either contention, the prof-

fered evidence was not expert medical testimony and would not, therefore, have enabled the appellants to meet their required burden of production.

### *A Parting Comment on the Insubstantiality of the Non–Medical Evidence of Non–Causation*

We are moved to make several additional observations. Quite aside from the failure of the appellants to present any expert medical testimony on the complicated medical question of non-causation, their non-expert evidence as to non-causation would have been woefully inadequate to meet their burden of production even if no expert medical testimony had been required.

The appellants' heroic attempt to conjure up a legally sufficient case of non-causation out of thin air illustrates once again the familiar phenomenon that most of the problems with which the law must deal turn out to be not legal problems at all but linguistic or semantic problems. The appellants profess to present for our admiring gaze an independent intervening cause for the appellee's disability of June 3. They have produced this *deus ex machina*, moreover, out of the mouth of the appellee himself. Or have they?

The appellants are ecstatic that the appellee once referred, in talking to the doctor who treated him for his "locked back" of June 3, to "the other injury." They adroitly avoid all further inquiry: "other than what?" The function of the adjectives "other" and "another" is to distinguish one item from some other item—the "this" which is "in here" from the "that" which is "out there." Without both reference points' being established, the mere abstraction of *otherness* is meaningless.

Everything the appellee said, buttressed by numerous and unequivocal clarifications, left no shadow of a doubt that he viewed the world from the tight little vantage point of June 3. It was into that little circle of reference that he received all questions and from that little circle of reference that he issued all answers. From the "this"—from the "in here"—of June 3,

he looked back eight months and referred to the earlier job-related injury of October 6 as "the other injury." "This injury" was waking up in bed on June 3 with a "locked back." As the appellee used the English language, the "other injury" of October 6 might have caused "this injury" of June 3, but it was not the same as "this injury." It was to him the "other injury."

With no basis at all in the testimony, the appellants simply proclaim, as an *ipse dixit*, that "this injury" is self-evidently the combined unit of June 3 and October 6 and that the phrase "other injury" must, perforce, have referred to some third and theretofore unrevealed injury, to wit, a possible independent and intervening cause. With the glibness of Bud Abbott doing his "Who's On First?" routine, they would persuade the Lou Costellos of the world that the other injury is actually part of this injury and that the "other injury," therefore, must be something "other than the other injury." Indisputably, that is not what the appellee said and not what the appellee meant and we are not buying it.

The second proof of non-causation that the appellants have confected out of nothing is an apparent admission from the appellee himself that his claim before the Workers' Compensation Commission was false. In the immediate aftermath of waking up on June 3 with a "locked back," the appellee told his doctor that his injury was "not job-related." Quite aside from the fact that his layman's diagnosis would not be expert medical testimony, his diagnosis was not what the appellants purport it to be.

What the appellee was saying was too clear to be twisted. His back did not lock up on him on the job; it locked up on him when he was home in bed. It was, moreover, not attributable to any unusual strain or accident that had occurred on the job the day before. The appellee thought and spoke in simple direct terms. There cannot be read into the appellee's testimony the convoluted interpretation that his back problem on June 3 was not a possible result of his accident back on October 6 and that that accident was not, in

turn, job-related. The appellee was communicating the simple and direct truth that his back went out on him on June 3 at home and not on the job.

Without their illusory independent intervening case and without their illusory admission by the appellee that his claim was false, where does that leave the appellants' proof of non-causation? It is reduced to 1) the eight-month lapse in time between the accident of October 6 and the herniation of the disc on June 3 and 2) the fact that the original accident was not catastrophic in dimension. Those evidentiary tidbits have some relevance and might be helpful to the appellants in casting doubt on the appellee's proof of causation, if and when the appellee is ever again called upon to prove causation. They do not, however, add up to legally sufficient proof of non-causation. The admissibility of evidence and the legal sufficiency of evidence are two very different phenomena.

*JUDGMENT AFFIRMED;*

*COSTS TO BE PAID BY APPELLANTS.*