## PATAPSCO LOAN COMPANY OF BALTIMORE CITY, A Corporation, and CHARLES W. HART.

### *vs.*

## MIGNONETTE K. HOBBS.

*Torts: unauthorized entry into house or room; trespass ab initio; damages; all direct injuries.   Evidence: legal sufficiency of—; question for the court; weight—for jury.*

The legal sufficiency of evidence is a question of law for the court, but the comparative weight and value of the testimony is a question that is for the jury exclusively, under proper instructions from the court.                                    p. 11

Every unauthorized entry upon the property of another is a trespass, which entitles the owner to a verdict for some damages.                                                       p. 15

Entry in a house, by permission, with subsequent entry by force in some or any of the rooms, constitutes a trespass *ab initio*.                                                 pp. 15-16

In actions of tort, the wrongdoer is liable for all direct injury resulting from his wrongful act, although the extent or special nature of the resulting injury could not, with certainty, have been foreseen as the probable result of the act done.  p. 16

Where there was evidence in the case that the agent of a loan company, while the plaintiff was ill and suffering in bed from the after-effects of an operation she had just undergone, forced himself in her room against the protests of the nurse, and by loud talk and threats frightened the plaintiff, and made her so nervous that her condition was much aggravated, etc., the case should be allowed to go to the jury.                p. 16

*Decided June 22nd, 1916.*

Appeal from the Superior Court of Baltimore City. (SOPER, C. J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*George W. Cameron,* for the appellants.

*William W. Varney,* for the appellee.

BRISCOE, J., delivered the opinion of the Court.

This is a suit by the plaintiff, a married woman, against the defendants to recover damages for injuries sustained by her caused, as alleged, by the negligent and wrongful conduct of the defendants.

The verdict was for the plaintiff and the defendants have appealed.

There is but one bill of exception in the record, and that presents the ruling of the Court in granting the plaintiff's prayer and in rejecting the defendants' first and second prayers.

The principal question is presented by the refusal of the Court to grant the defendants' first prayer, which asked the Court to rule, that under the pleadings and evidence, there was no evidence legally sufficient to entitle the plaintiff to recover, and their verdict must be for the defendants.

If the Court below was correct in refusing to grant the defendants' first prayer then there was no error in granting the plaintiff's prayer, which was the approved damage prayer, in similar cases, and no authority need be cited for its action in this respect.

The defendants' second prayer in substance asked the Court to instruct a verdict for one of the defendants, the Patapsco Loan Company, because there was no legally suffi-

cient evidence, to show, or tending to show, that the other defendant, Charles W. Hart, when he visited the premises of the plaintiff, was acting within the scope of his authority or that any of his acts while there were subsequently ratified by the defendant, the Patapsco Loan Company.

This prayer was properly refused, because the defendant Hart, testified, that he was not only the Secretary, Treasurer and the General Manager of the affairs of the loan company, but was the agent of the company, for the purpose of collecting the loan, due by the plaintiff to the company, and visited the home of the plaintiff on the 2nd day of February, 1915, the date upon which the injuries and wrongs are alleged to have occurred and to have been committed by the defendants.

The sole question then in the case, is, whether there was evidence legally sufficient to have required the case to be submitted to a jury under the testimony disclosed by the record.

It is the settled law of this State, as well as in England, that the legal sufficiency of evidence is a question of law for the Court, but the comparative weight and value of the testimony is a question exclusively for the jury, under proper instructions from the Court. *B. & O. R. R. Co.* v. *Keedy et al.*, 75 Md. 324; *Burke* v. *M. & C. C. of Balto.*, 127 Md. 562.

The declaration in this case contains three counts, and they aver in substance, that, on or about the second day of February, nineteen hundred and fifteen, the plaintiff, Mignonette K. Hobbs, was in lawful possession and occupancy of premises in the dwelling house known as No. 1115 West Mulberry street, in Baltimore City, that on said date the defendant, the said Patapsco Loan Company of Baltimore City, by means of its agent and servant, acting within the scope of his employment, and the said defendant Charles W. Hart did without permission and with force and arms break into and did forcibly and violently enter, and cause and procure to be entered, said premises of the plaintiff, then and there situate, she being then and there ill in bed, and the said

defendant and said agent and servant so acting within the scope of his employment, did then and there create such violent noise and commotion, and did by his action so frighten the plaintiff by such conduct of said defendant, agent and servant, that she thereby suffered a serious impairment of and injury to her nervous system, has been caused to suffer great physical pain and mental anxiety and is otherwise injured and damaged.

If there was any evidence legally sufficient or of a probative force to support the plaintiff's case, or if the evidence upon the material facts of the case was conflicting, the plaintiff was entitled to have the case passed upon by the jury and the Court below was clearly right in rejecting the defendants' first prayer.

As the prayer was in the nature of a demurrer to the evidence, it becomes necessary to review the testimony, upon which the ruling of the Court was based.

The plaintiff, testified, that she was a married woman about 34 years of age and resided at No. 1115 W. Mulberry street, Baltimore, Md.; that, on the 2nd day of February, 1915, she was confined to her room, from an operation that she had undergone in the Franklin Square Hospital by Dr. Tanner, about two weeks before that date, and was not able to leave her room, that she requested her niece to call up the Patapsco Loan Company, that she would be down the next day to pay a loan due it, but the defendant Hart stated that he would come up and receive the money. He came up at 2 o'clock and against the protests of the nurse entered her bed room, by pushing open the door, and upon not receiving the full amount of the indebtedness, said, "your husband promised me to pay everything today, and I will not accept the amount offered," and I said, "Mr. Hart, we can't do it, we have been under such expense." He replied, "it don't make any difference to me what your condition is, if that money does not come by tomorrow noon I will clear you out," that he got very much excited, approached within two feet of her bed and he shook his finger in her face. She fur-

ther testified, that when he left, she tried to get up and go out to get the money, but found she had lost the use of her limbs and could not get out of bed, that "when her husband got there, she was raving crazy and could not do anything, that she did not remember anything after she tried to get out of bed, because she lost consciousness after that," and that her physical condition was impaired by reason of the shock, and that she was seriously and greatly injured by reason thereof.

Mrs. William E. Klob, the nurse, who attended the plaintiff and who was with her on the 2nd of February, 1915, testified that the defendant pushed open the door and entered the room against her protests, that she stated the plaintiff was too ill to be seen, and that when he left the room he slammed the door. Q. What happened to Mrs. Hobbs, after he left? A. She went into convulsions, and I guess she laid that way about four hours. We 'phoned to Dr. Tanner and he came between half-past five and six that evening and found her in a very nervous state, and the doctor called every day after that for three weeks. Q. What have you to say about her consciousness? A. Well, she would come to; she would become unconscious for about an hour or so and then went right off in these spells again. Q. And that continued that evening? A. Yes, and the following day. Q. What about the night? A. In the night she got to screaming and carrying on like some one insane, and she did not know herself what she was doing. Q. How long did that continue? A. Until the following morning about ten o'clock. The doctor came down and shortly after he left she felt a little better, but she was still nervous and would go off in fainting spells every little while. Q. How often did that continue? A. She has them yet. Q. Had she ever had a fainting spell before? A. Well, I have been with my aunt four years in February and never saw her have a fainting spell before in my life. I have never known her to faint before.

Dr. Frederick N. Tanner, who was called as the physician, testified that he found her in a hysterical condition and the

delirium continued through the night, and a semi-delirious state continued for several days. Two or three days after that she was taken with severe hemorrhage, and the bleeding continued for ten days before he could check it. They continued until the first day of March with certain intervals. He also testified on making an examination the latter part of February, which was the first time I could really examine her on account of this bleeding, I found that the uterus had become broken away from its anchorage, and was sagging back into the pelvis in the same condition as previous to the operation, due to her violent movements during the delirium. That same operation is now necessary again, the bringing of the uterus upward and forward.

As to her nervous condition he said: Well, there is no question about the cause of the nervous condition being due to a shock. In her weakened condition, following a major operation of that kind, the nerve centers are entirely unbalanced, and are still, for the shock that she sustained at the time of the entrance into the room, or the cause as she described it. "Q. How long will that continue—that nervous condition? A. That is problematical. If she has the pelvic organ corrected, that may cause a cessation of the nervous condition. The pelvic disturbances are causes of nervous conditions in women. Q. How long will that pelvic disturbance last? A. Unless she has it anchored and corrected, it will continue and gradually grow worse from time to time. Q. Then her present condition is permanent? A. Without another operation, yes." He further testified, before this time he never knew Mrs. Hobbs to have any delirium, nor go into any fainting spells, but since this occurrence, after the operation she has had fainting spells at different intervals, sometimes a week or two apart and that "the major operation" has been nullified by the shock.

R. V. Hobbs, the plaintiff's husband, testified that when he got home on the afternoon of the 2nd of February, 1915, he found his wife in an unconscious condition. "She would go off and then she would holler and carry on and then she

would try to get out of bed, and we would hold her in bed, and then I went and called up the doctor," that her health and nerves were seriously affected, by the occurrence, and that she had frequent nervous and fainting spells since and her health was otherwise impaired.

The testimony upon the part of the defendants was to the effect that the defendant Hart was invited to the house on the occasion in question and in the room of the plaintiff, after reaching the hall of the house. The defendant testified he was not in the room over ten minutes, and that he spoke to the plaintiff in a normal tone and did not shake his finger in her face or use the threatening language attributed to him; that he did not accept the amount tendered, but said: "Mrs. Hobbs, your husband promised to pay this bill, because he thought this bill had been paid long ago," and she said, "Yes, Mr. Hart, he did, but I let him think that because he has so much worry on him," and I said, "What time does your husband arrive home?", and she said, "Six o'clock in the evening," and I said, "All right, tell him to come to see me to-morrow," and I walked out to the door and the niece followed me and closed the door and that was absolutely all that happened in the house on the occasion of his visit.

The principles of law, applicable to the facts of this case, have been settled, upon the authority of a number of well considered cases.

In *Gusdorf* v. *Duncan,* 94 Md. 169, it is said: Every unauthorized entry upon the property of another is a trespass which entitles the owner to a verdict for some damages. *B. & O. R. R. Co.* v. *Boyd,* 67 Md. 40; *Tome Institute* v. *Crothers,* 87 Md. 589. Furthermore, said the Court, the law especially protects one's dwelling house from invasion or disturbance. *Walsh* v. *Taylor,* 39 Md. 592.

And it was also said, in *Gusdorf* v. *Duncan, supra:* Even if the defendants' agents in the case at bar enter the plaintiff's house with her permission and then forcibly, or against her will or protest, went upstairs, through the passage and chambers of the house, their conduct would not only have

amounted to a trespass but would have constituted them trespassers *ab initio* \* \* \*." *Haines* v. *Haines,* 104 Md. 208; *Engle* v. *Simmons,* 148 Ala. 94; *Van Norden* v. *Robinson,* 45 Hun. N. Y. 567; *Watson* v. *Dilts,* 89 N. W. Rep. 1069; *Spearman* v. *McCrary,* 58 Southern Rep. 929.

In *Green* v. *Shoemaker,* 111 Md. 77, JUDGE PEARCE, in delivering the opinion of this Court, reviews the numerous cases upon this subject, and adpots the language of JUDGE ALVEY, in *Balto. City Pass. Rwy. Co.* v. *Kemp,* 61 Md. 80, as expressing the true doctrine upon the subject. JUDGE ALVEY said, the general rule is, in actions of tort like the present, that the wrongdoer is liable for all the direct injury resulting from his wrongful act, and that too, although the extent or special nature of the resulting injury could not, with certainty, have been foreseen or contemplated as the probable result of the act done.

And to the same effect are the cases of *B. & O. R. R. Co.* v. *Harris,* 121 Md. 272; *Sloane* v. *So. Cal. R. R.,* 111 Cal. 668; *Den. & R. G. R. R.* v. *Roller,* 100 Fed. Rep. 738; *P., B. & W. R. Co.* v. *Mitchell,* 107 Md. 600.

In view of the facts and circumstances of this case, and in the light of the legal principles, announced by this Court, and in other jurisdictions, we can not hold that the Court below committed an error in refusing to withdraw the case from the consideration of the jury.

There was evidence legally sufficient to go to the jury if believed by them, upon which the plaintiff could recover, under either count of the declaration, and as there were questions of fact to be determined by a jury, we can not properly disturb the judgment entered upon the verdict found by them.

Finding no reversible error in the rulings of the Court, the judgment must be affirmed.

*Judgment affirmed, with costs.*