710 A.2d 362

**Carol Sue HUNT, Personal Representative of the Estate of Charles Dell'uomo**

**v.**

**MERCY MEDICAL CENTER, et al.**

**No. 1476, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

May 29, 1998.

518

Marvin Ellin (Michael P. Smith and Ellin and Baker, on the brief), Baltimore, for appellant.

Peter E. Keith (Julie Ellen Squire and Gallagher, Evelius & Jones, L.L.P., on the brief), Baltimore, for appellee, Mercy.

Teri Kaufman Leonovich (Susan T. Preston and Goodell, DeVries, Leech & Gray, L.L.P., on the brief), Baltimore, for appellee, Fazekas.

Argued before MOYLAN, KENNEY and THIEME, JJ.

THIEME, Judge.

The issue presented in this case is whether emotional distress from being misdiagnosed with cancer is compensable within the physical injury rule. On the facts presented, we hasten to answer yes.

Charles Dell'uomo initiated a medical malpractice action before the Maryland Health Claims Arbitration Office after he was misdiagnosed as having prostate cancer and received several radiation treatments. He brought the action against four health care providers, including the present appellees, Victor A. Fazekas, M.D., and Mercy Medical Center.[1] Mr. Dell'uomo died of essentially unrelated causes prior to the hearing before the arbitration panel. In his place was substituted the personal representative of his estate, appellant Carol

---

[1] The other two health care providers were Radiation Oncology Affiliates of Maryland, which operated the radiation oncology department at Mercy, and Julia E. Blum, M.D., who administered the radiation treatments occasioned by the misdiagnosis.

Sue Hunt. The arbitration panel found no liability and issued an award in favor of all health care providers on 31 July 1996. On 13 August 1996, appellant notified the Arbitration Office that she rejected the award. She filed a complaint and an action to nullify the award in the Circuit Court for Baltimore City. She requested a jury trial. The other two health care providers besides appellees were dismissed from the case by stipulation on 22 October 1996. Dr. Fazekas filed a motion for dismissal or, in the alternative, summary judgment. Mercy Medical Center filed a motion for summary judgment. These motions were the subject of a hearing on 18 July 1997. The circuit court granted Dr. Fazekas's motion on the day of the hearing and granted Mercy Medical Center's motion on 4 August 1997. This appeal timely followed.

The issues presented for review are:

I. Whether appellant was required to prove the decedent's emotional injuries through expert testimony.

II. Whether Dr. Fazekas was an agent of Mercy Medical Center for purposes of liability.

As explained below, we must reverse as to each issue.

## FACTS

Upon the advice of urologist Stanley B. Silber, M.D., Mr. Dell'uomo submitted to a biopsy of his prostate at Mercy Medical Center in Baltimore on 9 March 1995. At that time, Mr. Dell'uomo was seventy-eight years of age. The specimen was submitted to the pathology department at Mercy. On the next day Dr. Fazekas recorded his diagnosis that Mr. Dell'uomo was suffering from a form of cancer.[2] On 15 March 1995, Mr. Dell'uomo returned to Dr. Silber's offices at Mercy, where Dr. Silber informed him that he had a relatively minor form of prostate cancer and that radiation treatment would be necessary.

---

**2.** Specifically, he found "moderately differentiated infiltrating adeno-carcinoma, Gleason grade $3 + 4 = 7$, Multifocal. Glandular hyperplasia."

Dr. Silber referred Mr. Dell'uomo to the Department of Radiation Oncology at Mercy for further consultation, and decisions were made to proceed with radiation treatment. On the 10th, 11th, and 17th of April, Mr. Dell'uomo met with radiation oncologists at Mercy to sign consent forms and to discuss his condition, the treatment, and the potential effects of each. The form signed on the 17th contained his acknowledgment:

That radiation therapy will have side effects which may occur during and immediately after treatment ("acute side effects") or later ("chronic" or "delayed" side effects), and which occur because radiation therapy affects normal tissue, and can damage normal tissues as well as cancerous tissues.

Among the acute side effects of the proposed treatment that have been described to me are: skin irritation; low blood counts; fatigue; urinary frequency; diarrhea; rectal irritation. Among the chronic side effects of the proposed treatment that have been described to me are: damage to bowel or bladder. I understand that no list of possible complications can be complete.

Mr. Dell'uomo was to be exposed to the radiation over approximately thirty-two separately administered treatments.

Radiation treatment began on April 17th. Fifteen separate radiation treatments were administered over the following three weeks before the misdiagnosis was discovered and communicated to Mr. Dell'uomo on May 8th. Left with hagridden doubts about what to believe, Mr. Dell'uomo sought the advice of Horst K.A. Schirmer, M.D., another urologist. At a meeting on May 15th, Dr. Schirmer informed Mr. Dell'uomo that the total amount of radiation administered was small enough that he was unlikely to suffer any side effects related to it. He also advised Mr. Dell'uomo to have another biopsy performed to confirm the negative diagnosis. Although frustrated, Mr. Dell'uomo did reluctantly submit to another biopsy. The result confirmed that he did not have prostate cancer.

Mr. Dell'uomo died in the spring of 1996 of causes that are not revealed in the record extract and are concededly not

relevant to this appeal. Appellant then substituted for Mr. Dell'uomo in her capacity as personal representative of his estate. At the arbitration hearing, appellant described her relationship to the deceased as "Companion."

Dr. Fazekas admitted his breach of the applicable standard of care in proceedings before the arbitration panel. The panel, nonetheless, ruled in favor of all the health care providers for reasons that are not reflected in the record extract. Before the circuit court, both appellees filed dispositive pretrial motions. Dr. Fazekas moved for dismissal or, in the alternative, for summary judgment. Dr. Fazekas argued that Mr. Dell'uomo suffered no compensable injury under the "physical injury" rule and that appellant failed to arbitrate in good faith by presenting no expert medical testimony. Mercy Medical Center made a motion for summary judgment on these two grounds plus the additional ground that it was not vicariously liable for Dr. Fazekas's alleged medical malpractice. The focus of oral arguments, presented at a hearing on 18 July 1997, was the need for expert testimony and the meaning of "good faith" arbitration. Dr. Fazekas's and Mercy Medical Center's motions for summary judgment were granted by orders that did not specify their particular rationales. Further facts will be added where appropriate for our discussion.

## DISCUSSION

### I. Expert testimony.

In reviewing a grant of summary judgment, we generally do not consider any issues but those decided below and will not affirm on any alternate grounds. *Henley v. Prince George's County,* 305 Md. 320, 333, 503 A.2d 1333 (1986). This presents the question of what issues actually were decided below and, hence, what issues are now before us. Appellant frames the issue before us as whether expert testimony was required in order to prove the decedent's emotional injuries. Mercy Medical Center and Dr. Fazekas each argue in favor of affirming the lower court based on this same issue and on the additional grounds that the deceased suffered no cognizable

physical injury and that appellant's failure to present expert testimony constituted a failure to arbitrate in good faith. All three of these issues were presented to the court below, but the court's orders, lacking its reasoning, are non-specific. The transcript of the hearing before the circuit court, however, reveals the court found that appellant's failure to present expert testimony constituted a failure to arbitrate in good faith. Since this ruling is premised upon the necessity to present expert testimony, and since expert testimony would be a moot point unless the injuries it pertains to are cognizable, we consider all three issues to be properly before us.

### -cognizability-

Although appellant may once have claimed the right to recover for both physical and emotional injuries arising from the negligent misdiagnosis, appellant is arguing only in support of damages for Mr. Dell'uomo's emotional injuries. Any claims for damages from purely physical injuries resulting from the misdiagnosis are waived.

 Within the field of negligence law, the rule in Maryland is that any "physical injury" is compensable if that injury is "capable of objective determination." *Belcher v. T. Rowe Price Found., Inc.*, 329 Md. 709, 734, 621 A.2d 872 (1993) (quoting *Vance v. Vance*, 286 Md. 490, 500, 408 A.2d 728 (1979)). The adoption and development of this rule is recounted in detail both in *Belcher*, 329 Md. at 722–36, 621 A.2d 872, and in *Vance*, 286 Md. at 495–501, 408 A.2d 728. In brief, the Court of Appeals in 1909 rejected the traditional rule that there could be no recovery absent a "physical *impact*" and adopted the "modern rule" permitting recovery for any "physical *injury* " arising out of the defendant's negligence, regardless of physical impact. *Green v. Shoemaker*, 111 Md. 69, 83, 73 A. 688 (1909). In the context of this rule, however, the term "physical" carries a meaning that may differ from the common understanding or the dictionary definition of the term. *Vance*, 286 Md. at 500, 408 A.2d 728. A compensable "physical injury" may be demonstrated simply by evidence of a distressed mental state. *Id.* Therefore, although we may

casually characterize a purported injury as being either physical or emotional in nature (as we will in our ensuing discussion), the distinction is merely descriptive and not of legal significance. The doctrinally correct position is that an emotional injury (such as mental anguish or emotional distress) may come within the ambit of the "physical injury" rule by virtue of its outward manifestations.[3] The only limitation on recovery for an emotional injury, imposed to guard against feigned claims, is that the injury must be "capable of objective determination."[4] *Id.*

To better understand what is, and is not, a compensable injury, we examine precedent. In the seminal *Green* case, the

---

**3.** Unfortunately, the type or degree of manifestation that must be shown is not defined.

**4.** Appellees argue that no emotional injury is compensable unless it results in a *"clearly apparent* and *substantial* physical injury."* This is no longer the applicable standard. This language is traceable to *Bowman* and remained the standard for many decades. It did not, however, survive *Vance.* As the Court of Appeals stressed in *Belcher,* it is *"Vance's* explication of *Bowman"* that represents "the present status of the law of Maryland." *Belcher,* 329 Md. at 732, 621 A.2d 872. Ever since *Vance,* the Court of Appeals has relied exclusively on the *Vance* formulation and has not even cited the *Bowman* standard, except for historical purposes. Although this Court appears to have been more reluctant to abandon the *Bowman* language, *see, e.g., Laubach v. Franklin Square Hosp.,* 79 Md.App. 203, 218, 556 A.2d 682 (1989); *Abbott v. Forest Hill State Bank,* 60 Md.App. 447, 456, 483 A.2d 387 (1984), we have applied the "capable of objective determination" standard exclusively in our post-*Belcher* cases. *See Montgomery Cablevision Ltd. Partnership v. Beynon,* 116 Md.App. 363, 388, 696 A.2d 491 (1997); *Bagwell v. Peninsula Reg. Med. Ctr.,* 106 Md.App. 470, 518, 665 A.2d 297 (1995).

Furthermore, although appellees appear to interpret the old *Bowman* standard as imposing a higher threshold on compensability, it is by no means clear that *Bowman's* rule differs appreciably from *Vance's.* In spite of *Bowman's* reference to "substantial" physical injuries, the sentence containing that language immediately follows a sentence in which the Court reaffirmed the axiom that "there is a remedy for every *substantial* wrong." 164 Md. at 404, 165 A. 182 (emphasis added). In context, therefore, *Bowman* may well have intended "substantial" not to mean "ample," as appellees apparently suggest, but rather to mean "not illusory" or "actual," much the same as we might employ the term "substantive" today. This reading of *Bowman's* standard conveys a

defendants were blasting rocks in the vicinity of the plaintiff's residence, causing substantial damage to the house, as well as objects within. On one occasion, the blast broke every window in the plaintiff's room and overturned her furniture. On another occasion, a 22–pound stone crashed through the ceiling and landed on the plaintiff's bed. The Court noted that the blasting lasted from April through the fall and that the plaintiff, as well as other occupants of the house, "often had to leave their meals and run to the cellar, and were in terror all night of being killed." 111 Md. at 73, 73 A. 688. The plaintiff also "stayed up all night in a chair for the better part of six weeks while they were blasting across the river." *Id.* The plaintiff testified,

> my nerves were completely broken down through fright, and I was not able to do my work. Before that time I was in ordinary health, and never was nervous. Since then I have had no health at all. Dr. Miller attended me for this nervousness, and he came every day during the latter part of April, and after that every week or so until fall.

*Id.* Dr. Miller testified that the plaintiff developed "nervous prostration" as a result of the blasting, *id.,* and her husband testified that she had become "a nervous wreck," who, as a result, was unable to attend to "her household duties" for the first time in their marriage. *Id.* at 74, 73 A. 688. The Court found that the issue of her recovery for damages could be submitted to the jury, as she had shown "a material physical injury" resulting from her fright. *Id.* at 77, 73 A. 688.

The Court of Appeals applied *Green* in three subsequent cases that, for differing reasons, are of little assistance to us. *Great Atlantic & Pacific Tea Co. v. Roch,* 160 Md. 189, 153 A. 22 (1931); *Patapsco Loan Co. v. Hobbs,* 129 Md. 9, 98 A. 239 (1916); *Baltimore & Ohio R.R. Co. v. Harris,* 121 Md. 254, 88 A. 282 (1913). In *Harris,* the plaintiff was crossing a street in front of a stopped train when a loud blast of the train whistle and a sudden escape of steam so startled her that she fainted.

---

meaning that is quite similar to *Vance*'s requirement that an injury be merely "capable of objective determination."

As she fell, her jaw struck the train track and was seriously injured. The Court of Appeals permitted recovery for the injury to her jaw by application of *Green,* but it appears from the Court's treatment of the evidence that the plaintiff never sought compensation for the emotional aspects of her injury. 121 Md. at 268–71, 88 A. 282. In *Hobbs,* the plaintiff was in bed recovering from a uterinary operation when an agent of the defendant loan company came into her bedroom and accosted her regarding a loan payment. She was so greatly upset that she endured fainting spells and episodes of delirium, resulting in convulsions that undid the effects of her operation and necessitated a repeat procedure. Although there is much discussion of the plaintiff's mental state, the Court's disposition of the case never makes clear whether her mental state was compensable or whether it merely established causation. 129 Md. at 15–16, 98 A. 239. In *Roch,* the plaintiff sought to recover for injuries sustained when she opened a package expecting to find the loaf of bread she had ordered but instead found a dead rat, whereupon she fainted. Her declaration alleged both physical and mental injuries, and the Court of Appeals stated that the evidence supported a conclusion that "she became a 'nervous wreck.'" 160 Md. at 192, 153 A. 22. Although that evidence is described as "ample," the Court's opinion recounts none of it. *Id.*

*Bowman v. Williams,* 164 Md. 397, 165 A. 182 (1933), was for many decades the polestar in the area of emotional distress. The plaintiff, William Williams, watched from the first-floor window of his house as a large truck, loaded with coal and driven by the defendant's agents, lost control down a steep and icy hill and crashed into his house at a point directly beneath his window. The truck crashed through the stone foundation and into the basement room where his two young boys were playing. The boys were unharmed, and the violent impact did not even cause the plaintiff to lose his balance. Nevertheless, the fright he experienced during the brief ordeal out of concern for his own safety and that of his children had a lasting impact. The Court's primary focus was on rejecting the defendant's contention that one may not recover

based on fright for the safety of another, but the Court did give a reasonably detailed description of the evidence presented regarding the emotional injury.

> The fright of the plaintiff and his alarm for the safety of his two young sons occasioned by this accident were, however, such a shock to his nervous system that he fell to the floor of the dining room immediately after the impact of the truck with the fabric of the house, and was carried into the kitchen in weak and hysterical condition. The doctor was sent for, and the plaintiff remained in bed for two weeks under regular medical treatment. From a state of normal health, the plaintiff immediately became and continued quite weak and nervous, as was manifested to his family physician and an expert consultant in nervous disorders, by tangible evidence not susceptible of simulation, and by the absence of any physical reason for his condition. He was unable to work for six months, and after that period the testimony is that his condition gradually improved and is now about normal.

*Id.* at 399, 165 A. 182. Neither the defendant nor the Court questioned the sufficiency of this evidence to demonstrate a compensable injury.

*Vance* is now the definitive installment in this line of cases. *See Belcher,* 329 Md. at 733, 621 A.2d 872. The plaintiff, Muriel Vance, brought a suit for negligent misrepresentation against her husband, Arnold Vance, or, rather, the man she believed was her lawful husband during their "marriage" of almost twenty years. Arnold discovered approximately one month after their wedding ceremony in 1956 that his prior divorce had not become final until about two and one-half weeks after that ceremony, but he did not disclose this information until he brought an action to annul the marriage sometime after February 1974. In the meantime, the couple had raised two children. The evidence of Muriel's emotional distress was set forth in detail. Her mother testified that Muriel "was in a state of emotional collapse" after Arnold filed for annulment. 286 Md. at 493, 408 A.2d 728. Muriel testified as follows:

I just—I couldn't function, I couldn't sleep, I was totally embarrassed by the fact that he had filed this and it became public knowledge, once it's filed. I consider it defamation of my character. I was too embarrassed to go out and socialize with people that tried to be kind to me. And I just couldn't function. I really thought I was going to have a nervous breakdown. And I even now have symptoms of an ulcer.

*Id.* Muriel's son by a former marriage testified that in the days following her discovery that the marriage was void, he was frightened by his mother's emotional depression. He said that he had great difficulty communicating with her because she appeared detached, unaware of her own presence, and she spent long periods of time crying and sobbing. He described how her physical appearance changed from that of a beautiful woman to that of "a wreck," with unkept hair, sunken cheeks, and dark eyes. *Id.* at 494, 408 A.2d 728. He even feared she would end up in an asylum. Based on all this, the Court concluded that there was sufficient evidence to come within the meaning of "physical injury," explicitly defined for the first time as meaning injury "capable of objective determination." *Id.* at 500, 408 A.2d 728.

Subsequently, this Court had the opportunity to address this same issue in *New Summit Assocs. v. Nistle,* 73 Md.App. 351, 533 A.2d 1350 (1987). In that case the, plaintiff established that her landlord was negligent in failing to warn her of the latent defect of peepholes scratched in her bathroom mirror by workmen next door. The landlord claimed on appeal that Ms. Nistle had suffered no compensable injury. We disagreed, and in affirming said, "Appellee's nervous shock, resulting in nausea, diarrhea, and an inability to sleep, was therefore a compensable injury...." *Id.* at 362–63, 533 A.2d 1350. There is no indication from our opinion that anyone other than the plaintiff herself had testified regarding these effects of her nervous shock.

Not every claim for mental anguish, however, is successful. Most notably, in *Roebuck v. Steuart,* 76 Md.App. 298, 544 A.2d 808 (1988), this Court found that the plaintiff/appellant had not

produced sufficient evidence to create a jury issue regarding her mental anguish arising from an attorney's malpractice. The sole evidence of mental anguish consisted of the following testimony:

I went to see Dr. Rendler who is a psychologist I had seen once before a couple years after I moved in with my mother and realized there was nothing left and John was falling apart. There was no house. I went to see him about six times.

*Id.* at 315, 544 A.2d 808. We considered this evidence to be clearly inadequate, and we noted, "The psychologist did not testify and Roebuck did not testify as to any symptoms, counseling or treatment." *Id.* In fact, we considered the evidence to be so inadequate that it did not even amount to a "feigned claim" of mental anguish. *Id.* at 316, 544 A.2d 808.

Most recently, in *Bagwell v. Peninsula Reg. Med. Ctr.,* 106 Md.App. 470, 665 A.2d 297 (1995), we rejected a claim of mental anguish in a holding that may suffer for being dicta. A former police officer had sued the hospital that terminated his employment after he struck a patient during an emergency room altercation. The lower court granted judgment in favor of the defendant hospital on Bagwell's only negligence count, wherein Bagwell had alleged that his discharge caused him emotional and mental distress. We first held that any issue regarding this count was not properly before us, since Bagwell had not presented any arguments at all in support of that claim of error. *Id.* at 517, 665 A.2d 297. We then commented that, "[e]ven if we were to consider the merits of this claim," the count alleged nothing more than negligent infliction of emotional distress, which is not recognized as an independent cause of action in this State. *Id.* Only then did we continue even further into the fray and "hold" that there was insufficient evidence of mental anguish presented to render the injury capable of objective determination. *Id.* at 518, 665 A.2d 297. That evidence consisted solely of Bagwell's deposition testimony, which we summarized as establishing only that "appellant was in 'total shock,' became severely depressed,

had difficulty sleeping, became introverted, lost his appetite, and was embarrassed to go out in public." *Id.*

We distill three generalizations from the foregoing case law before turning to the facts of the instant appeal. First, in order for an injury to be capable of objective determination, the evidence must contain more than mere conclusory statements, such as, "He was afraid," or, "I could see that he was afraid." The evidence must be detailed enough to give the jury a basis upon which to quantify the injury. Second, a claim of emotional injury is less likely to succeed if the victim is the sole source of all evidence of emotional injury, as *Bagwell* demonstrates. This phenomenon may be a purposeful bulwark against feigned claims or it may simply flow from the need for objective rather than subjective determinations. It need not be an absolute bar to recovery, however, as *New Summit* seems to demonstrate. There is no reason why the victim's own testimony may not be sufficient, as long as it otherwise provides the jury with enough information to render his or her injuries capable of objective determination. Third, although minor emotional injuries may be less likely to produce the kind of evidence that renders an injury capable of objective determination, that does not mean that an emotional injury must reach a certain threshold level of severity before it becomes compensable. There is no severity prong of the *Vance* test. Our focus thus is properly on the evidence of mental anguish produced and not on the nature of the act causing the injury, the foreseeability of mental anguish therefrom, nor on the likely severity of such foreseeable anguish. It also follows, therefore, that if two people experience an identical shock and suffer identical levels of resulting emotional distress, it is entirely possible that only one would exhibit objectively determinable manifestations of that injury.

Given that this appeal is from a grant of summary judgment, we must view all of the evidence in the light most favorable to appellant. *Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307 (1995). The evidence of Mr. Dell'uomo's emotional distress arises from three sources. The

first of these sources is the deposition of Dr. Schirmer, whom Mr. Dell'uomo visited after learning that his diagnosis of cancer was erroneous. The relevant portions of Dr. Schirmer's testimony are as follows:

> A. Mr. Dell[']uomo was not a man of many words. He was very upset, he was very skeptical, and it took me a great deal of time and persuasion that he will need [a] further biopsy and examination in order to assess what is correct and what isn't correct.
>
> . . .
>
> He expressed to me at the time that why should he believe this if now he's told that there is no cancer, when he's been told before there was cancer? Of course, he had a point. But I said, "Well, Mr. Dell[']uomo, you come here to seek the truth, and I'm doing my best to create answers to what is at issue, and I'm sorry to say, but this is the only way we can do it."
>
> This discussion extended for—which is unusual for me—for almost an hour, until he finally conceded that he will do so.
>
> Q. Do you recall anything else that was said by either he or Ms. Hunt at that conversation?
>
> A. I think that's the sum total of it. I think it has to do with—well, that, one, he was emotionally upset and he was very skeptical.

■ This evidence alone is not sufficient to demonstrate any mental injury that is capable of objective determination. The only references to emotional distress are the simple, unadorned statements that Mr. Dell'uomo was upset. This provides no information useful to a jury for setting a level of damages and does not satisfy the *Vance* test. Most of Dr. Schirmer's testimony relates to Mr. Dell'uomo's skepticism. We do not consider skepticism to be a form of mental or emotional injury. Skepticism connotes a higher level of cognitive function rather than an injury. Appellant appears to concede this, but she argues that Dr. Schirmer's testimony shows how scared and confused Mr. Dell'uomo must have

been, to have needed such a long period of persuasion to agree to trust another doctor with a diagnostic test. Although this explanation is closer to the mark, the above testimony alone is too indirect to render such fear and confusion capable of objective determination, especially since all direct references are to mere skepticism.

The second source is Mr. Dell'uomo himself. Mr. Dell'uomo died prior to the arbitration hearing but not before sitting for a deposition that was introduced at the arbitration hearing. As Dr. Schirmer noted, Mr. Dell'uomo proved to be a man of few words. His testimony regarding his own condition was characterized by short, conclusory statements of his basic emotional state. It tended to lack the detail required to render that emotional state capable of objective determination. The following excerpts are typical of his testimony. They represent most of his statements in the record extract regarding emotional distress:

Q. How would you describe your health today?

. . .

A. Well, I tell you, I'm really—I'm concerned, I'm worried you know what I mean, I'm worried and I think about what could have happened or what's going to happen. And I'm, you know, I don't sleep at night. I can't believe what happened to me, you know.

Q. Let me ask you this way. I'm asking about your physical health, how would you describe your physical health today?

A. Well, all right, okay. And the frustration, you know.

. . .

Q. Was it your understanding that if you went through the radiation you'd have a good chance of being cured of the cancer?

. . .

A. No. See, believe me, when I started radiation treatment, I was scared, I thought that was it, you know what I mean, I thought—I thought I was going to die, I mean.

. . .

Q. Did you understand that it might get rid of the cancer?

A. I was hoping it would but it wasn't in my mind that way, you know what I mean, you know, I thought the worst.

. . .

Q. Any other physical problems that you've experienced since May of 1995?

A. Well, no, but just the stress and the aggravation and the worrying about it you know. . . .

. . .

Q. Can you tell me, sir, how being diagnosed with cancer and then having the diagnosis changed back again and receiving the radiation, can you tell me how that's affected you mentally and psychologically?

A. Well, I say it affected me a lot because, I mean, I think about it, you know, I worry about it, and I'm scared.

These statements are just as deficient as the deposition statements made in *Bagwell.*

Some other aspects of Mr. Dell'uomo's testimony, however, did describe more specific manifestations of his emotional distress, such as fatigue, sleeplessness, and constipation:

Q. And the problems you had with your bowels, what problem did you have? Did you become constipated?

A. Yeah, I was constipated, right.

Q. And how long did you experience that?

A. About a week, a week.

. . .

Q. Did getting the radiation, did it cause you any problems in being able to do anything around the house?

A. Yeah. I got tired, I get tired more than before I had— before I had the radiation, you know, it wasn't nothing for me to walk uptown without stopping. Now I got to, just to go down to Inner Harbor, I've got to stop two or three times.

. . .

Q. And I believe you told Mr. Barley that you were having sleepless nights.

A. Yes, very, very sleepless nights, very sleepless nights.

Q. How often does that happen, sir, when you don't sleep at night?

. . .

A. Every night. I get so mad at people sleeping and I'm awake walking the floor.

Q. Did that happen last night?

A. Yeah, last night too. 1 had to be here and all night I was awake.

Q. Does that happen on a regular basis ever since you've had this?

A. Yeah, regular basis.

Q. So it happens every night?

A. Every night, every night.

Q. How much sleep have you gotten per night since you had this radiation?

A. Well, I tell you, I don't get much sleep at night. During the day, I might take catnaps, sitting down, catnap.

. . .

Q. Mr. Dell'uomo, you mentioned these sleep problems that you had. Did you have these problems before May of 1995?

A. No, no. I'm a heavy sleeper.

These details regarding the duration of the constipation, the types of activities with which the fatigue interfered, and the incessant nature of the sleeplessness would give a jury at least some of the information necessary for quantifying a level of damages attributable to his mental injury.

But by far the most helpful testimony came from appellant during her appearance as a witness before the arbitration

panel. She had this to say about Mr. Dell'uomo's emotional injuries:

Q. What did you observe about the effect of radiation treatments?

A. Oh, he was extremely tired and extremely upset. He was very frightened.

. . .

Q. . . . Was there a cumulative effect, or was his behavior or his fatigue the same throughout?

A. I would say the same throughout.

. . .

Q. What did you notice in terms of the effect on him in terms of his day-to-day living?

A. He became more irritable. I noticed Charlie's mood changed. I think it was a very stressful situation for him. That's how I would best describe it.

Q. How did it affect his activities?

A. He didn't walk as much. There were several occasions we turned down invitations because he didn't feel up to it. At times, it did affect his eating habits, and just the worry. I knew, I mean, the worry on his face.

Q. Okay. You mentioned the fact that he had no problem sleeping before. How, if any, did that change, his sleeping?

A. He was up every night, walking around. Just couldn't sleep. Worried.

Q. On the occasions that you would go out and you were with other people, what did you observe about his interaction with other people after he found out that he had cancer and subsequently learned he didn't have cancer, as opposed to before, when he would interact with other people?

A. Oh, he was more quiet. And he was there, but not there, you know. Just extremely quiet. Didn't have too much to say.

. . .

Q. We talked about Mr. Dell[']uomo's emotional state during this period, but what did you notice physically? What physical effects did the radiation have on him?

A. Being extremely tired. Extremely tired. That's what I really noticed. He had a few bowel problems, eating problems, but the tiredness was what I really noticed.

Q. ... [T]he symptoms that you described, did they continue until his death, or ...

A. Yes.

Q. How was he up until the time just before he died? How was he in terms of the things you described?

A. It was constant. From the very time that he was told he had it until he was told he didn't have it until he passed away. I mean, I lived with that every single day. There wasn't a day went by that you could (sic) see it. Deteriorated. Worry. Stress. It can kill you.

This testimony, together with Mr. Dell'uomo's own testimony, shows a reasonable basis for his anxiety and is sufficient to render Mr. Dell'uomo's emotional injury capable of objective determination. Certainly for any person to be told by his or her physician that such person has cancer is a shock. There is testimony from which a jury could find that his fear and stress caused him to experience fatigue, sleeplessness, constipation, and mood change,[5] as well as from which a jury could determine an appropriate level of damages for each.

---

**5.** Appellant in her brief alleges that Mr. Dell'uomo also complained of a burning sensation during urination around the time of the radiation treatments. The record extract, however, in its 231 pages contains no evidence that Mr. Dell'uomo ever complained of such an ailment, and we are not disposed to search the actual record for such evidence on appellant's behalf. The claim is not preserved for review, and we will not address it. Md. Rule 8–501; *Tretick v. Layman,* 95 Md.App. 62, 85, 619 A.2d 201 (1993). Appellant may take solace in the fact that even had we addressed Mr. Dell'uomo's urinary burning and found it capable of objective determination, appellant still could not have recovered damages thereon because we would have ruled *infra* that the causal connection between this physical discomfort and Mr. Dell'uomo's mental anguish was too complicated a medical question for a jury to consider without the assistance of expert medical testimony.

We thus find that his emotional distress comes within the physical injury rule and is compensable.

-expert testimony-

 As previously noted, the lower court determined, at least implicitly, that expert medical testimony was required to prove causation in this case. Appellant argues that the causation issue is one within the competence of the jury. Appellees do not dispute that strong emotions can flow from the news that one has cancer, but they do raise a challenge to the causal connection between that emotional response and Mr. Dell'uomo's symptoms. The seminal case on the need for expert medical testimony remains *Wilhelm v. State Traffic Safety Comm'n*, 230 Md. 91, 185 A.2d 715 (1962), and the following passage is still the leading summation of this issue:

There are, unquestionably, many occasions where the causal connection between a defendant's negligence and a disability claimed by a plaintiff does not need to be established by expert testimony. Particularly this is true when the disability develops coincidentally with, or within a reasonable time after, the negligent act, or where the causal connection is clearly apparent from the illness itself and the circumstances surrounding it, or where the cause of the injury relates to matters of common experience, knowledge, or observation of laymen. However, where the cause of an injury claimed to have resulted from a negligent act is a complicated medical question involving fact finding which properly falls with the province of medical experts (especially when the symptoms of the injury are purely subjective in nature, or where disability does not develop until some time after the negligent act), proof of the cause must be made by such witnesses.

*Id.* at 99–100, 185 A.2d 715 (citations omitted). The question of whether expert medical testimony is required thus is a function of whether causation is a "complicated medical question" or not. That determination, in turn, calls for a robust dose of that not-so-common commonsense. For an insightful discussion of the need for expert medical testimony, *see* Judge

Moylan's opinion in *S.B. Thomas, Inc. v. Thompson,* 114 Md.App. 357, 371–83, 689 A.2d 1301 (1997).

A summary review of the case law in the realm of physical injury causation reveals that expert medical testimony has been required to establish the causal relationship between an auto accident and a leg injury which did not manifest itself for six months and which "gave way" two years after that, *Johnson v. Zerivitz,* 234 Md. 113, 117–18, 198 A.2d 254 (1964); between a rear-end automobile collision producing head and shoulder injuries and the partial paralysis of the plaintiff's left forefinger and thumb occurring six weeks later, *Craig v. Chenoweth,* 232 Md. 397, 400–01, 194 A.2d 78 (1963); between an automobile accident and lower back and abdominal pain associated with the plaintiff's menstrual cycle, *Wilhelm,* 230 Md. at 101, 185 A.2d 715; between an automobile accident and the maceration and softening of a fetus's body, as well as the destruction of its brain tissue, *Superior Transfer Co. v. Halstead,* 189 Md. 536, 541, 56 A.2d 706 (1948); between an automobile accident and the rupture of a placenta five months later, *Symington v. Graham,* 165 Md. 441, 449, 169 A. 316 (1933); between an automobile accident and an extra-uterinary pregnancy, *Abend v. Sieber,* 161 Md. 645, 647–48, 158 A. 63 (1932) (*dicta*); between an automobile accident and pancreatitis developed several months later, *Strong v. Prince George's County,* 77 Md.App. 177, 184, 549 A.2d 1142 (1988); between a spinal injury from an automobile accident and a knee injury sustained during heavy lifting over a year later, *Schweitzer v. Showell,* 19 Md.App. 537, 543, 313 A.2d 97 (1974); and between an automobile accident and a recurrence of ileitis, *Kraft v. Freedman,* 15 Md.App. 187, 194, 289 A.2d 614 (1972). In one case, the Court of Appeals even required expert medical testimony to establish a causal link between a streetcar collision and a passenger's disk injury, at least where there was no expert medical testimony substantiating the existence of the injury, there was testimony asserting that the plaintiff had not been a passenger on the streetcar in question, and the injury was not evident until several minutes after the accident. *Ager v. Baltimore Transit Co.,* 213 Md. 414, 420–21,

132 A.2d 469 (1957). *See also Langenfelder v. Jones,* 178 Md. 421, 428, 13 A.2d 623 (1940) (in workers' compensation case, expert medical testimony required to establish causation between accidentally falling on an iron form and an appendicitis abscess occurring over a week later) (*dicta*); *American Airlines Corp. v. Stokes,* 120 Md.App. 350, 707 A.2d 412 (1998) (same regarding causation between lifting a piece of luggage by one with chronic back problems and lumbar nerve root damage claimed four months later); *S.B. Thomas,* 114 Md. App. at 384, 689 A.2d 1301 (same regarding causation between a workplace back injury and a herniated disk developing nine months later).

Arrayed in opposition are a comparatively smaller number of cases finding that the causes of certain physical injuries could be proven without reliance on medical experts. No such expert testimony is required to show the causal connection between rinsing one's mouth with water containing a high concentration of household lye and immediate burning of the skin and mucous membranes, *Vroom v. Arundel Gas Co.,* 262 Md. 657, 664, 278 A.2d 563 (1971); between being struck in the leg by an automobile and subsequent reduced ability to walk and to perform household chores, *Straughan v. Tsouvalos,* 246 Md. 242, 258–59, 228 A.2d 300 (1967); between a facial bruise suffered in an automobile accident and a loss of pigmentation to that same area arising before the bruise had completely healed, *Wilhelm,* 230 Md. at 104, 185 A.2d 715; or between drinking from a bottle containing a dead mouse and nausea accompanied by repeated vomiting. *Coca Cola Bottling Works, Inc. v. Catron,* 186 Md. 156, 161, 46 A.2d 303 (1946). *See also Atlas Gen. Indus., Inc. v. Phippin,* 236 Md. 81, 88, 202 A.2d 767 (1964) (in workers' compensation case, no expert medical testimony required to establish causation between a leg-breaking slip-and-fall and pain in the left arm and shoulder noticed the next day) (*dicta*).

In the domain of emotional injuries, there is a similar line of demarcation between causal relationships which do, and do not, require expert medical testimony. For example, in *Wilhelm,* the Court found the need for such testimony in the case

of a woman who claimed that as a result of an automobile accident she suffered from a psychological condition that caused her unconsciously to exaggerate her physical injuries. 230 Md. at 101, 185 A.2d 715. Medical experts had been presented who testified to the existence of this condition, but lacking was the causal connection between the accident and this specific disorder. In a singularly similar case decided the very next year, the Court again required expert medical testimony to establish causation regarding another emotional injury that allegedly caused the plaintiff to exaggerate his physical injuries unconsciously. *Johnson*, 234 Md. at 117, 198 A.2d 254. Although the plaintiff did produce a psychiatrist who stated his opinion that this condition was caused by "the automobile accidents," no lay or expert witness attributed the condition to the single auto accident at issue in the case. *Id.*

No such testimony, however, was required in *Vance*. Muriel Vance claimed emotional injuries arising from her husband's disclosure that their twenty-year marriage was void. Specifically, the Court of Appeals ruled that a jury was competent to weigh the causal relation between the shocking revelation and the following injuries:

> She went into a state of shock, engaged in spontaneous crying and for a period seemed detached and unaware of her own presence. She was unable to function normally, unable to sleep and too embarrassed to socialize. In addition to experiencing symptoms of an ulcer, Muriel suffered an emotional collapse and depression which manifested itself in her external condition, *i.e.*, her significantly deteriorated physical appearance—unkept hair, sunken cheeks and dark eyes.

286 Md. at 501, 408 A.2d 728. We find particularly noteworthy the fact that, in the context of *Vance*'s facts, the jury was competent to establish causation regarding ulcer symptoms.

A similar result was reached in *Tully v. Dasher*, 250 Md. 424, 244 A.2d 207 (1968). The two female plaintiffs sued for emotional distress arising from a malicious prosecution. The Court of Appeals allowed the jury, without benefit of expert

testimony, to establish the causal connection between the tortious act and the following manifestations of mental anguish, all of which arose during the week after the tortious act: increased susceptibility to migraine headaches, exacerbation of pre-existing stomach ulcers, vomiting, and nose bleeds. *Id.* at 436, 244 A.2d 207. Applying the *Wilhelm* standard, the Court found these matters to be "of common experience, knowledge or observation by lay persons." *Id.* at 437, 244 A.2d 207.

Thus, while there may yet lurk some alleged manifestations of emotional injury that are themselves so medically complicated that expert testimony will almost always be required in order to show causation (such as an unconscious tendency to exaggerate physical injuries), other manifestations will tend to be resolved on a case-by-case basis. If the malady is common, if it tends to arise from emotional distress, and if it arises contemporaneously with the emotional distress, then it is highly probable that no complicated medical question is present. A jury is then capable of determining whether causation is established or not. On the other hand, if the malady is unusual, if it is not easily foreseeable as a result of emotional distress, or if it does not arise contemporaneously with the onset of the emotional distress, then the issue is far more probable to present a complicated medical question requiring the assistance of expert testimony. Furthermore, an otherwise simple issue of causation may become a complicated medical matter if under the facts of the case there is a possibility that the symptoms predated the emotional shock or arose from an independent source.

 In the present case, we have determined that Mr. Dell'uomo suffered from constipation, sleeplessness, fatigue, and mood change. These are common maladies. They are entirely foreseeable results of shock, mental anguish, or emotional distress. It certainly does not take a medical expert to understand that stress and strong emotional responses are fatiguing and can affect one's sleeping patterns. Perhaps constipation presents the closest issue, but this is a common discomfort with which jurors are likely to have had sufficient experience to permit a reasoned conclusion as to causation.

*Cf. New Summit,* 73 Md.App. at 362–63, 533 A.2d 1350 (permitting recovery for mental injury resulting in diarrhea, nausea, and inability to sleep, apparently without expert medical testimony, but without discussing the need for such). We find that any reasonable juror is competent to decide whether Dr. Fazekas's negligent misdiagnosis was the cause of Mr. Dell'uomo's alleged injury.[6]

Appellees assert that none of Mr. Dell'uomo's ailments manifested themselves until he was subjected to radiation, a full month after he was told he had cancer. This lapse in time, they allege, removes this case from the class of cases involving contemporaneously-arising symptoms. It turns causation into a complicated medical question. We disagree, based on the facts before us. In the first place, the evidence, read in the light most favorable to appellant, reveals that both appellant and Mr. Dell'uomo testified that at least some of Mr. Dell'uomo's symptoms dated back to the time he was told he had cancer. Moreover, Mr. Dell'uomo's complaint sought damages for emotional distress arising from both the shock of being told he had cancer and the fear of the side effects of the radiation, each one of which shares a direct causal relationship with the negligent misdiagnosis. The symptoms are thus contemporaneous with one of the events which allegedly triggered the emotional injury. There is no temporal gap giving rise to a need for expert medical testimony.

### -good faith-

Having established that no expert medical testimony was required in this case, it follows that the lower court erred in holding that the failure to present such testimony constituted

---

**6.** As noted *supra* note 3, the claim that Mr. Dell'uomo suffered from urinary burning has not been preserved. Even if it had been we would have found it to present a complicated medical question of causation requiring expert medical testimony. Although the phenomenon is not so rare that it is unheard, urinary burning is not a common or usual result of mental anguish. Rather, it is among the class of maladies that is commonly thought to arise from a variety of sources entirely independent of mental distress, and for that reason it requires an expert's testimony to establish causation.

a failure to arbitrate in good faith. We therefore reverse the lower court's ruling without the necessity for discussing any further aspect of the meaning of good faith arbitration.

### -damages-

Appellees have also argued that damages, if recoverable at all, must be limited according to the holding of *Faya v. Almaraz*, 329 Md. 435, 620 A.2d 327 (1993). In that case, the Court of Appeals ruled that the plaintiffs could recover damages for their fears of having contracted the HIV virus from a surgeon who failed to disclose his HIV-positive status. Such damages, however, must be limited to the period between discovering the risk of infection and learning the negative results of blood tests for HIV. According to the Court, since these tests are at least 95% accurate just six months after exposure, any lingering fears would be unreasonable as a matter of law. Appellees argue that, under *Faya*, appellant cannot recover for any emotional distress occurring after Mr. Dell'uomo learned that his second biopsy came back negative for prostate cancer and after Dr. Schirmer informed him that he was unlikely to suffer any side effects from the interrupted radiation treatments.

We decline to reach this issue. It is unnecessary to our disposition of the case and we do not believe it was decided below. We note, however, that appellant's broad reading of *Faya* appears to create tension between that case and other cases permitting recovery for the continuing effects of a shock or a fear long after the shocking or fearful event terminated. We leave the resolution of this issue, if it arises at all, for the lower court.

### II. Mercy Medical Center's vicarious liability.

Appellant also challenges the lower court's ruling that Mercy Medical Center is not vicariously liable for Dr. Fazekas's negligent misdiagnosis.[7] Although the lower court's order

---

7. There apparently is no active contention that Mercy Medical Center acted negligently; vicarious liability is thus the sole viable theory of Mercy's liability.

granting summary judgment in favor of Mercy is non-issue specific, we find that the issue of vicarious liability is properly before us. Mercy clearly raised the issue as its lead-off argument in its summary judgment motion, and, as noted at the outset, the lower court did not grant Mercy's motion until over two weeks after the date on which the court held the hearing and granted Dr. Fazekas's motion. Under the circumstances, it would not be appropriate to read the grant in favor of Mercy as limited to the issues raised in the hearing. Instead, we read it as granting summary judgment as to all issues raised in the motion, allowing us to reach vicarious liability.

Appellant alleges that a genuine issue of material fact exists concerning whether Mercy Medical Center and Dr. Fazekas share a master-servant relationship, and thus whether Mercy is vicariously liable for the doctor's negligence. Mercy Medical Center claims that Dr. Fazekas is not its employee but rather the employee of Maurice B. Furlong, M.D., P.A., an independent contractor that operates the entire pathology department at Mercy. Thus, Mercy asserts, there is no dispute of fact that Dr. Fazekas is an independent contractor for whom Mercy is not vicariously liable.

Generally, a principal is vicariously liable for the negligence of its agent when the two share a master-servant relationship but not when the agent is merely an independent contractor of the principal. *Sanders v. Rowan,* 61 Md.App. 40, 51, 484 A.2d 1023 (1984). The ultimate test for whether an agent is also a servant is control, for a master "controls or has the right to control the physical conduct of the [servant] in the performance of the service." *Id.* (quoting Restatement of Agency 2d, § 2(1)). In support of her argument, appellant cites to the Professional Services Agreement governing the relationship between Mercy and Maurice B. Furlong, Jr., M.D., P.A., which is admittedly the employer of Dr. Fazekas. Mercy is able to exercise some degree of control over Dr. Fazekas pursuant to a number of provisions in this agreement. For example, Article I of the agreement requires Maurice B.

Furlong, Jr., M.D., P.A. (referred to therein as "the Association") specifically to hire Dr. Fazekas and to obtain his resignation from his prior employment with Mercy for the express purpose of accepting employment with the Association. The Association further agreed that its doctors, including Dr. Fazekas, "will devote their full time and best efforts to the practice of medicine for the Hospital" and that "no other enterprise or occupation shall be allowed to conflict with or in any way impair the ability of its physicians . . . to discharge their obligations to the Hospital." The Association is required to obtain Mercy's express prior written consent before a physician employed by the Association may render professional services "to or for any other person or firm for compensation." Association doctors are also required to enter into time allocation agreements with Mercy for each pay period. Mercy, in its own name, performs all billing for the Association and its physicians, and the Association has assigned all of its rights to fees to Mercy. Employees of the Association are directly "accountable to the Medical Executive committee, Hospital Administration and Hospital Board of Trustees for the quality of services rendered," and Mercy has "the right to review and approve the qualifications of all physicians . . . employed by . . . the Association. This review shall include the usual Hospital credentialing process which the association agrees will apply to all physicians . . . who will perform physician services at the Hospital." The Association agreed to require its employees to abide by "the policies and Bylaws of the Medical Staff and the Hospital" and to require its employees to "be subject to all the policies, ethics, moral principles, rules and regulations and orders promulgated by the Hospital and the Medical Staff organization." The Association is also required to cooperate with Mercy's requirements concerning continuing medical education of Association doctors.

The contractual rights of control that Mercy had over Dr. Fazekas's hiring, work schedule, billing, credentialing, continuing education, and performance of his professional duties is certainly sufficient to create an issue of fact as to whether Mercy has the right to control Dr. Fazekas's physical

conduct in the performance of his service. Thus, the issue of whether a master-servant relationship existed is one for the jury to decide, and the lower court should not have granted summary judgment in favor of Mercy as to vicarious liability.

 Additionally, we find genuine issues of material fact to be present regarding Mercy Medical Center's liability *via* apparent authority. The Court of Appeals has endorsed § 267 of the Restatement (Second) of Agency, which provides, in part:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill or such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or the agent as if he were such.

*See, e.g., Mehlman v. Powell,* 281 Md. 269, 273, 378 A.2d 1121 (1977).

In *Mehlman,* the Court of Appeals upheld a finding of vicarious liability where the victim went to the emergency room of a hospital, not knowing that the emergency room was operated by a purported independent contractor. An emergency room physician misread an electrocardiogram, leading to the victim's death, and the hospital argued that it could not be liable for the independent physician's negligence. In rejecting that argument, the Court quoted with approval *Stanhope v. Los Angeles College of Chiropractic,* 54 Cal.App.2d 141, 128 P.2d 705, 708 (1942): "[I]t cannot seriously be contended that respondent, when he was being carried from room to room ... should have inquired whether the individual doctors who examined him were employees ... or were independent contractors."

In the instant case, Mr. Dell'uomo did not engage Dr. Fazekas individually. Rather, Mercy Medical Center held itself out to the public offering and rendering hospital services, and Mr. Dell'uomo relied on Mercy to conduct a biopsy. Mercy undertook to provide this biopsy and to furnish the required doctors and staff for a charge. Having undertaken

to provide this service, Mercy was under a duty to do so effectively. Mr. Dell'uomo could properly assume that the doctors and staff of Mercy were acting on behalf of Mercy. He is not necessarily bound by the limitations that may be contained in a private contract between Mercy and the pathology department. We find the *Mehlman* case sufficiently analogous to the present one that its holding should be followed and the issue of apparent authority should be determined by a jury.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**